1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES S. BROWN,

11          Petitioner,              No. CIV S-00-0559 MCE JFM P

12      vs.

13   R. Q. HICKMAN,                  ORDER AND

14          Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on

18   charges of making terrorist threats and being an ex-felon in possession of a firearm, and the

19   sentence of twenty-nine years to life imposed thereon pursuant to California's Three Strikes Law.

20   Petitioner raises twenty-five claims in his amended petition, filed November 29, 2000.

21                              FACTS[1]

22          [Petitioner] went to Grady's Pizza in Weaverville one night.  He
            looked grubby and unclean.  He ordered three large pizzas; he said
23          he had miners to feed.

24   _____

25          [1]  The facts are taken from the opinion of the California Court of Appeal for the Third
     Appellate District in <u>People v. Brown</u>, No. C028121 (Apr. 7, 1999), a copy of which is attached
26   as Exhibit 3 to Respondents' Answer, filed April 4, 2001.

                                1

[Petitioner] appeared drunk or under the influence of drugs. One witness described him as "spun out of his gourd." He said he had the best crystal in town, meaning methamphetamine. He said he did not care if anyone "narc'd" him because he would just return and blow their heads off.

[Petitioner] wrote a check for $100 for the pizzas on the account of Paul Hill. The total cost was about $60, but he wanted to give a 40-dollar tip. [Petitioner] could not write the check, so the waitress wrote it for him. The manager agreed to take an out-of-town check without identification just to get rid of [petitioner]. The waitress was scared of [petitioner] and hid in the bathroom until he was gone.

[Petitioner] became more agitated, complaining his pizzas were taking too long. He told Bob Beyer, the cook, "'See this face. It's the last face you'll ever see.'" [Petitioner] was serious and Beyer was so scared he was shaking. The workers at the restaurant tried to keep [petitioner] calm and give him what he wanted.

Another employee, Kenneth Wilkins, testified [petitioner] did not physically threaten him, but did become combative. [Petitioner] told him and Beyer that he would blow their heads off. At first Wilkins testified [petitioner] said he had a shotgun, but on cross-examination he stated [petitioner] never mentioned a gun. Wilkins learned about the shotgun from the police. [Petitioner] left the restaurant and went to his car. Wilkins thought [petitioner] was going to get his gun; Wilkins got a butcher knife for protection. Someone called the police and when [petitioner] learned of it, he got in his car and left.

A highway patrol officer responding to the call saw [petitioner]'s car that matched the description given. [Petitioner] headed to Round Table Pizza and got out of his car. The officer told [petitioner] to stop; he responded he was not driving and took off running. The officer saw a gun in the car. [Petitioner] was found in the brush and appeared very intoxicated.

In his car the police found a shotgun, ammunition, empty beer cans, and one-half bottle of Wild Turkey Whiskey. The shotgun was in the front between the driver's and passenger's seats.

[Petitioner] was charged with three counts of making terrorist threats, forgery, being a convicted felon in possession of a firearm, being a convicted felon in possession of ammunition, resisting an officer with threats and violence, driving under the influence, displaying an altered license plate, and driving with a suspended license. It was alleged he had eight prior convictions for burglary and had served three prior prison terms. The counts for forgery and driving with a suspended license were later dismissed.

At trial [petitioner]'s mother testified the shotgun was hers.  She claimed she left it in the backseat and gave [petitioner] the keys to the car that day.

[Petitioner] admitted his prior record; he had been a thief most of his life, but claimed he was not violent.  He testified Paul Hill had given him permission to write up to a 100-dollar check to repay a debt.  [Petitioner] went to Grady's and ordered pizzas; he gave the workers a 40-dollar tip.  Wilkins and Beyer first offered him a beer, but then insulted him, calling him "'a fucking flatlander.'"  [Petitioner] backed down from the challenge and went to his car to smoke a cigarette.  He wanted to cancel his order, but they refused.  Wilkins had a knife and told [petitioner] to get out.  [Petitioner] left angry and shaking.  [Petitioner] denied he knew there was a gun in the car.

The jury found [petitioner] guilty of the threats, being a convicted felon in possession of a firearm and ammunition.  It found him not guilty of the vehicle offenses and guilty of misdemeanor resisting arrest.

[Petitioner] retained private counsel and moved for a new trial on multiple grounds, including that [petitioner] was not competent to stand trial, his trial counsel was ineffective in failing to investigate mental defenses, and there was insufficient evidence of threats.  In support of this motion, [petitioner] provided mental health reports on him while in jail.  [Petitioner] had been on several hunger strikes, threatened suicide, and had been diagnosed with post-traumatic stress disorder and depression and was given psychotropic drugs.

[Petitioner] also provided a declaration in which he detailed his traumatic childhood.  When he was 13 he saw two priests having sex and ran away from the Catholic school.  He went to San Francisco where he met a man who wanted to turn him into a prostitute and have him make snuff films.  He was abused and finally ran away.  He helped prosecute the man and was the subject of a television documentary.  [Petitioner] was promised that neither his face nor identity would be revealed.  He was shown and recognized by everyone at school and ridiculed.

Defense counsel also provided a declaration of his discussion with Dr. Albert Globus about post-traumatic stress disorder.  Dr. Globus indicated that the disorder could impact [petitioner]'s mental state to the point he lacked specific intent or was insane.

The court ordered a limited inquiry into [petitioner]'s mental competence.  After the inquiry was completed, the court stated it had no doubt as to [petitioner]'s competence.

/////

3

At the hearing on [petitioner]'s motion for a new trial, [petitioner]'s trial counsel testified he was not aware [petitioner] had been diagnosed with post-traumatic stress disorder, but he knew [petitioner] took medication for anxiety.  He did not consult with any mental health experts about possible defenses because [petitioner] had a clear understanding of what he did and was able to explain and articulate it.  [Petitioner] insisted he was not intoxicated.  In counsel's opinion, the only viable defense was to present [petitioner] as a sane, sober person with an explanation for what happened.

A licensed clinical social worker who worked at the jail believed [petitioner] had post-traumatic stress disorder.  But he testified that except when [petitioner] was dehydrated from refusing fluids, he was in fine mental health and well oriented.  His problems arose when he was dehydrated.

Dr. Shepherd Greene, a psychiatrist, testified he originally diagnosed [petitioner] with post-traumatic stress disorder, but later determined [petitioner] was engaging in antisocial behavior and malingering.

The trial court denied the motion for a new trial, except as to the count of making threats against the victim who hid in the bathroom.  The court granted a new trial on this count and then dismissed it.

The court chose not to exercise its discretion to strike any priors or to reduce the threat counts to misdemeanors.  It imposed a life sentence on count one with a minimum term of 25 years, four years for the prior prison terms, and concurrent life sentences on the other felonies.

(Ex. 3 to Answer, People v. Brown, slip op. at 2-6 (hereinafter Opinion).)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

/////

4

1        (2) resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
2        State court proceeding.

3  28 U.S.C. § 2254(d).

4        Under section 2254(d)(1), a state court decision is "contrary to" clearly

5  established United States Supreme Court precedents if it applies a rule that contradicts the

6  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9  (2000)).

10        Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11  habeas court may grant the writ if the state court identifies the correct governing legal principle

12  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14  simply because that court concludes in its independent judgment that the relevant state-court

15  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 76

17  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

18  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19        The court looks to the last reasoned state court decision as the basis for the state

20  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

21  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

22  habeas court independently reviews the record to determine whether habeas corpus relief is

23  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

24  /////

25  /////

26  /////

1  II.  Petitioner's Claims

2      A.  Eighth Amendment (Claim I)[2]

3          Petitioner's first claim is that his sentence of twenty-nine years to life in prison is

4  cruel and unusual punishment.  The last reasoned state court opinion on this claim is the decision

5  of the California Court of Appeal on petitioner's direct appeal.  (Exs. 3 and 4 to Answer.)  That

6  court  rejected the claim, finding that

7          petitioner had a record of continuous criminal activity despite
           several prison sentences.   His current offenses included three
8          felonies, making threats and possessing a weapon.  In these
           circumstances we cannot say his punishment was "'out of all
9          proportion to the offense . . . ' [citation] so as to shock the
           conscience and offend fundamental notions of human dignity." (In
10         re DeBeque (1989) 212 Cal.App.3d 241, 249.)

11  (Ex. 3 to Answer, People v. Brown, slip op. at 13-14.)

12         In Andrade, the United States Supreme Court made clear that, in the context of an

13  Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law

14  amenable to the 'contrary to' or 'unreasonable application of' framework is the gross

15  disproportionality principle, the precise contours of which are unclear, applicable only in the

16  'exceedingly rare' and 'extreme' case."  538 U.S. at 73 (citing Harmelin v. Michigan, 501 U.S.

17  957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983); and Rummel v. Estelle, 445 U.S.

18  263, 272 (1980)).  The Andrade Court concluded that two consecutive 25-years-to- life sentences

19

20         [2]  Petitioner has numbered his first two claims Claim I and Claim II.  The next twenty-
    three claims are numbered 1 through 23.  In their answer, respondents have simply numbered
21  petitioner's claims in order; for instance, petitioner's claim 1 is designated by respondents as
    claim 3.  For purposes of clarity, this court will identify petitioner's first two claims as he has
22  numbered them (claims I and II).  Petitioner's subsequent claims will be identified with
    petitioner's numbering system and respondents' numbering system; i.e., petitioner's claim 1 will
23  be referred to as claim 1/3.  In addition, respondents have merged some of petitioner's claims
    together for purposes of analysis.  For instance, several of petitioner's claims of ineffective
24  assistance of counsel, which contain different claim numbers in the amended petition, are
    analyzed by respondents as one claim.  In order to prevent confusion, this court will analyze each
25  of petitioner's claims separately using the claim numbers petitioner has assigned to them.
    However, for purposes of overall clarity, the court will analyze some of petitioner's claims out of
26  the order in which they were presented in the amended petition.

with the possibility of parole, imposed under California's three-strikes law following two petty

theft convictions with priors, did not amount to cruel and unusual punishment.  Id. at 77; see also

Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of 25 years to life imposed for

felony grand theft under California's three-strikes law did not violate the Eighth Amendment).

"Outside the context of capital punishment, successful challenges to the proportionality of

particular sentences have been exceedingly rare."  Rummel, 445 U.S. at 272.

In Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), the United States Court of

Appeals for the Ninth Circuit held, post-Andrade, that a three strike sentence of twenty-five years

to life in prison for a third shoplifting offense, a "wobbler" under state law[3], constituted cruel and

unusual punishment.  In Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the court of appeals

distinguished Ramirez, finding that the petitioner in Rios had a "lengthy criminal history," had

"been incarcerated several times," and because the strikes used to enhance the petitioner's

sentence had "involved the threat of violence."  Id. at 1086.

In the instant case, the offense of making terrorist threats is a "wobbler" under

California law.  See California Penal Code § 422.  Petitioner made a motion in the trial court to

reduce these offenses to misdemeanors, which was denied.  While California's ex-felon in

possession of a weapon statute also has a "wobbler" provision, see California Penal Code §

12021(c)(1), petitioner was not convicted under that section.  Instead, he was convicted under the

straight felony provision of § 12021.  See California Penal Code § 12021(a)(1).  In addition,

petitioner has a lengthy criminal history that began with a commitment to Boys Ranch as a

juvenile and includes, as an adult, eight prior felony convictions for first degree burglary (Clerk's

Transcript on Appeal (CT) at 546), as well as convictions for use of a stolen credit card, credit

card theft, and forgery.  (Ex. 3 to Answer, People v. Brown, slip op. at 13.)

/////

---

[3] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony under applicable law.  See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

1    Under all of the circumstances, this court finds that petitioner's sentence does not

2 fall within the type of "exceedingly rare" circumstance that would support finding that his

3 sentence violates the Eighth Amendment.  The state courts' rejection of petitioner's Eighth

4 Amendment claim was neither contrary to, nor an unreasonable application of, controlling

5 principles of clearly established federal law.  Petitioner's first claim for relief should be denied.

6    B.  Ineffective Assistance of Counsel/Failure to Investigate (Claim II)

7    In Claim II, petitioner claims that his trial attorney failed to investigate potentially

8 meritorious defenses.  Specifically, petitioner contends that counsel: (1) did not adequately

9 investigate petitioner's mental health history, which included a diagnosis of post-traumatic stress

10 disorder, severe childhood trauma, and medication with several psychoactive medications while

11 in custody; (2) failed to investigate whether petitioner was significantly intoxicated at the time of

12 the crime; and (3) failed to consult with any experts concerning possible defenses based on

13 petitioner's mental state.  Petitioner argues that a defense based on petitioner's lack of mental

14 capacity could have negated the specific intent required for his conviction of making terrorist

15 threats and being a felon in possession of a firearm.

16    The last reasoned state court opinion on this claim is the decision of the California

17 Court of Appeal on petitioner's direct appeal.  (Exs. 3 and 4 to Answer.)  The appellate court

18 concluded that petitioner had failed to demonstrate substandard performance or prejudice,

19 reasoning as follows:

20    Trial counsel explained he did not consult with mental health
     experts about possible mental defenses because [petitioner] could
21    articulate what happened that night and insisted he was not
     intoxicated. [Petitioner] contends counsel's failure to explore
22    possible mental defenses cannot be deemed a tactical choice
     because he made it without proper investigation.  To render
23    competent assistance, counsel must perform certain basic duties,
     including investigating carefully all defenses of fact or law.
24    (People v. Pope (1979) 23 Cal.3d 412, 424-425.)

25    Trial counsel was not aware that [petitioner] had been diagnosed
     with post-traumatic stress disorder. [Petitioner] faults him for
26    failing to consult with experts or review the mental health notes

8

from the time [petitioner] was in jail.  These avenues of investigation may not have been as helpful in formulating a defense as [petitioner] suggests.  Dr. Greene, while initially diagnosing [petitioner] with post-traumatic stress disorder, later came to believe [petitioner] was malingering and inventing symptoms.  Even the licensed clinical social worker who maintained the diagnosis was proper, thought [petitioner] was well oriented and functioning when he was not dehydrated.  While trial counsel knew of [petitioner's] traumatic childhood, he had no information to tie it to the events of the night in question.  On appeal [petitioner] has failed to show that connection.

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny. [Citations.]" (People v. Ledesma (1987) 43 Cal.3d 171, 216.)  On the facts available to trial counsel, we cannot say his failure to more fully investigate a mental defense was deficient performance.

Further, even if counsel was deficient in his lack of investigation, [petitioner] has failed to show prejudice. [Petitioner] has not shown his mental problems resulted in a lack of specific intent. [petitioner's] clear recall of the events that night, even if sharply divergent from all other witnesses, weighed heavily against the success of a mental defense.  The jury was instructed on intoxication and defense counsel argued it could negate specific intent.  Despite all of the evidence from prosecution witnesses that [petitioner] was under the influence or "spun out of his gourd," the jury acquitted him of driving under the influence.

[Petitioner] has failed to show he was denied effective assistance of counsel.

(Opinion at 10-12.)

In order to prevail on a claim of ineffective assistance of counsel, petitioner must show two things: an unreasonable error and prejudice flowing from that error.  First petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 688 (1984).  The court must determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id. at 690.  "Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation."  United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986).

1  Second, petitioner must prove prejudice.  Strickland at 693.  To demonstrate

2  prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's

3  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

4  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

5  The focus of the prejudice analysis is on "whether counsel's deficient performance renders the

6  result of the trial unreliable or the proceeding fundamentally unfair."  Lockhart v. Fretwell, 506

7  U.S. 364, 372 (1993).

8  The court record reflects that petitioner's trial counsel did not investigate a mental

9  health defense to the charges against petitioner but chose instead to present a defense based on

10 petitioner's explanation of the events and his intentions on the night in question.  This decision

11 was not only reasonable, it was dictated by the situation confronting petitioner's trial attorney.

12 At the hearing on petitioner's motion for new trial, when asked whether he considered a defense

13 based on petitioner's history of mental health problems, counsel responded:

14        The answer is no, because [petitioner] had a very clear
          understanding of what he had done.  He was able to articulate what
15        he had done.  He was able to explain what he had done.  The kinds
          of mental defenses and stress defenses that would possibly
16        normally be considered did not seem appropriate in view of his
          recollection of events.

17

18 (RT at 393.)  At trial, petitioner took the stand in his defense and testified that the employees at

19 Grady's insulted and threatened him.  He had a clear memory of all of his actions and was able to

20 provide an explanation for those actions.  He testified that he had consumed two alcoholic drinks

21 and a beer, but denied that he "felt the effects."  (RT at 176.)  Petitioner also denied that he was

22 under the influence of "drugs."  (Id.)  Under these circumstances, counsel reasonably chose to

23 investigate and present the defense that petitioner did not commit the charged acts.  Having

24 chosen this defense, his duty to investigate the directly conflicting defense that petitioner was the

25 aggressor in the situation but was too intoxicated to form intent was "at an end."  Bean v.

26 Calderon, 163 F.3d 1073, 1082 (9th Cir. 1998).

10

1    The Court of Appeals for the Ninth Circuit has made it clear that it is not

2  reasonable to forego investigation into a mental health defense where the only defense left is

3  weak or untenable.  See Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (in a capital case,

4  where trial counsel was on notice of client's mental health and drug abuse problems, counsel was

5  obliged to conduct a thorough investigation in order to determine whether a mental state defense

6  might have been better than the "weak" alibi defense he had decided on early); Johnson v.

7  Baldwin, 114 F.3d 835, 839-40 (9th Cir. 1997) (counsel's failure to investigate led to

8  presentation of a defense that was "incredibly lame").  Here, however, petitioner's defense was

9  not weak or untenable.  Notwithstanding the fact that petitioner's version of the events differed

10  from that of the other witnesses, he presented a rational explanation for his behavior.

11    In addition, for the reasons explained by the state appellate court, petitioner has

12  failed to demonstrate prejudice.  Even assuming arguendo that counsel should have investigated

13  a mental health defense, there is no "reasonable probability that, but for counsel's unprofessional

14  errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

15  Although there was evidence that petitioner was intoxicated, there is no evidence that his

16  intoxication prevented him from forming the requisite intent.  Indeed, as noted by the state

17  appellate court, petitioner's jury acquitted him of driving while intoxicated.  Further, although

18  there was evidence that petitioner required medication and medical intervention for anxiety and

19  depression while in jail awaiting trial and sentence, there is no indication that these problems

20  prevented him from forming specific intent.  In short, there is no evidence before this court that

21  further investigation into a possible mental health defense would have resulted in a more viable

22  defense than the one counsel presented.  The California Supreme Court's decision denying this

23  claim is not contrary to or an objectively unreasonable application of Strickland.  Accordingly, it

24  should not be set aside.  Andrade, 538 U.S. at 76.

25  /////

26  /////

11

C.  Procedural Default

Twenty-two of petitioner's claims were raised for the first time in a petition for writ of habeas corpus filed in the California Superior Court.  (Answer, Ex. 5.)  The Superior Court denied fourteen claims without citation to authority, on the grounds that petitioner had failed to establish that the claims were not or could not have been raised on appeal.  (Id.)  Petitioner subsequently filed a petition for writ of habeas corpus in the California Court of Appeal, which rejected petitioner's claims with a citation to In re Hillery, 202 Cal.App.2d 293, 294 (1962) (holding that in the absence of extraordinary circumstances the court had discretion to refuse to issue a writ of habeas corpus "on the ground that application has not been made therefor in a lower court in the first instance."  (Answer, Ex. 6.)  Petitioner raised the same claims in a petition for writ of habeas corpus filed in the California Supreme Court, which summarily rejected then without citation to authority.  (Answer, Ex. 7.)  Respondents argue that the California Superior Court's opinion constitutes a procedural bar precluding this court from addressing these fourteen claims on the merits.[4]  Although the Superior Court did not cite caselaw in support of its rejection of petitioner's claims, respondents identify In re Dixon, 41 Cal.2d 756, 759 (1953) as the correct citation for the Superior Court's decision.[5]

As the United States Supreme Court has explained, in all cases in which a state prisoner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The state rule is only

---

[4]  Respondents identify these claims as "3, 4, 7, 9, 10-15, 20-22, and 24."  (Answer at 15.)

[5]  Dixon held that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction.

1    "adequate" if it is "firmly established and regularly followed." Id. (quoting Ford v. Georgia, 498

2    U.S. 411, 424 (1991)); Bennett v. Calderon, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

3    adequate, the state law ground for decision must be well-established and consistently applied").

4    The state rule must also be "independent" in that it is not "interwoven with the federal law."

5    Park v. California, 202 F.3d 1146, 1152 (9th Cir. ), cert. denied, 531 U. S. 918 (2000) (quoting

6    Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). Even if the state rule is independent and

7    adequate, the claims may be heard if the petitioner can show: (1) cause for the default and actual

8    prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the

9    claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

10           When applying the AEDPA and reviewing whether a state court decision is

11   contrary to federal law, this court must look to the state's last reasoned decision as the basis for

12   its judgment. Avila v. Galaza, 297 F.3d 911, 918 & n.6 (9th Cir. 2002). Assuming arguendo that

13   the California Supreme Court adopted the reasoning of the California Superior Court in denying

14   petitioner's claims, and assuming that the Superior Court rejected the claims identified by

15   respondents for the reasons set forth in In re Dixon, this court rejects respondents' claim of

16   procedural bar.

17           The relevant date for determining the adequacy of a state procedural rule used to

18   bar a claim is the time of the purported default. Fields v. Calderon, 125 F.3d 757, 760-61 (9th

19   Cir. 1997). The California Supreme Court found that petitioner should have raised this claim on

20   appeal. Petitioner filed his appellate brief on June 23, 1998. (Answer, Ex. A.) Accordingly, for

21   purposes of the Dixon default, the relevant date is June 23, 1998. Fields, 125 F.3d at 760. On

22   August 3, 1998, the California Supreme Court decided In re Robbins, 18 Cal. 4th 770 (1998),

23   making it clear that it would no longer consider federal law in denying a petition on untimeliness

24   grounds. The Ninth Circuit has held that a California court's pre-Robbins denial of a state

25   habeas petition for a Dixon violation does not bar subsequent federal review. Park, 202 F.3d at

26   1152. Because the date of petitioner's default occurred prior to the decision in Robbins, the

1  Superior Court's reliance, if any, on In re Dixon, does not operate as a procedural bar to

2  consideration of the merits of petitioner's claims in this court.[6]

3     D.  Unconstitutional Application of Cal. Pen. Code §§ 12021(a) and 12316(b) (Claim

4        4/6)

5        Petitioner claims that his convictions for being an ex-felon in possession of

6  ammunition and a firearm, in violation of Cal. Pen. Code §§ 12021(a) and 12136(b), should be

7  set aside because those statutes were applied "in an unconstitutional manner." (Points and

8  Authorities attached to Am. Pet. (hereinafter Am. Pet.) at 12.)  In the traverse, petitioner explains

9  that he is a "State Sovereign Citizen" invoking "common law," and that, under common law, the

10  term "firearm" is limited to a gun capable of being concealed upon the person and with a barrel

11  of less than 16 inches in length.  (Traverse at 18-19.)  Petitioner argues that he "was never in

12  possession of anything that fit the definition of a concealable firearm as charged under Penal

13  Code section 12021(a)" because the gun found in his vehicle had a "barrel length of twenty five

14  inches, plus."  (Am. Pet. at 12.)[7]

15        Petitioner's claim in this regard was rejected by the California Superior Court

16  with the following reasoning:

17        In Ground #4 petitioner claims that Penal Code §§ 12021(a) and
         12316(b) are unconstitutionally applied to petitioner.  Petitioner
18        argues that the court has no jurisdiction because though he did

19

20     [6]  In 1993, the California Supreme Court issued two opinions attempting to clarify
      California's "timeliness" and Dixon rules.  In re Clark, 5 Cal. 4th 750; In re Harris, 5 Cal. 4th
21     813 (1993).  Accordingly, the Ninth Circuit has also found that the Dixon rule was not
      consistently applied prior to 1993.  Fields, 125 F.3d at 763-64; Bean, 96 F.3d at 1130-31.

22     [7]  Cal. Pen. Code § 12021(a) provides:

23     Any person who has been convicted of a felony under the laws of the United States, of the
      State of California, or any other state, government, or country, or of an offense
24     enumerated in subdivision (a), (b), or (d) of Section 12001.6, or who is addicted to the
      use of any narcotic drug, who owns, purchases, receives, or has in his or her possession or
25     under his or her custody or control any firearm is guilty of a felony.

26

1
2
3
4

> possess a Remington Model 870-20-gauge shotgun, it had a barrel length it [sic] excess of 25 inches and therefore was not concealable.  Petitioner argues the law as it related to concealable weapons or firearms possessed by ex-felons prior to 1990.
>
> Petitioner was convicted under the law that prohibits ex-felons from possessing any firearm.

5   (Answer, Ex. 5 at consecutive p. 2.)  Petitioner counters that "just because the "State of"

6   California has redefined the term "Firearm" and then written that redefined term in the Penal

7   Code, does not automatically make that constitutional, especially in the Petitioner's case where

8   evidence of self-defense was presented at trial."  (Am. Pet. at 16.)  In support of petitioner's

9   claims in this regard, he cites California law, California cases interpreting California law, and

10  several United States Supreme Court cases interpreting federal statutes.  See United States v.

11  Miller, 307 U.S. 174 (1939); United States v. Lopez, 514 U.S. 549 (1995)

12          The decision by the California Superior Court rejecting petitioner's claim is not

13  contrary to or an unreasonable application of federal law and should not be set aside.  Petitioner

14  was not convicted of violating a federal statute.  Accordingly, federal cases interpreting federal

15  statutes and/or definitions contained in federal statutes have no application to petitioner's claim.

16  The California Superior Court concluded that petitioner was correctly charged and convicted

17  under a state statute that was in effect at the time he committed his crimes.  The state court's

18  conclusion in this regard may not be set aside in this federal habeas corpus proceeding.  See

19  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (a federal writ is not available for alleged error in

20  the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir.

21  1993) (federal courts are "bound by a state court's construction of its own penal statutes");

22  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (a federal habeas court must defer

23  to the state court's construction of its own penal code unless its interpretation is "untenable or

24  amounts to a subterfuge to avoid federal review of a constitutional violation").  There is no

25  evidence of subterfuge.  Accordingly, petitioner is not entitled to relief on this claim.

26  /////

E.  Jury Instruction Error (Claim 5/7)

Petitioner's next claim is that his federal due process rights were violated by the trial court's failure to give sua sponte jury instructions on self-defense.  (Am. Pet. at 17-18.) Specifically, petitioner suggests that the following jury instructions should have been given: (1) CALJIC No. 5.30 ("It is lawful for a person who is being assaulted to defend [himself] from attack if, as a reasonable person, [he] has grounds for believing and does believe that bodily injury is about to be inflicted upon [him]); (2) CALJIC No. 5.50 ("A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat"); (3) CALJIC No. 5.51 ("Actual danger is not necessary to justify self-defense . . . the person's right of self-defense is the same whether the danger is real or merely apparent"); and (4)  CALJIC No. 5.54 (allows, under certain circumstances, the right of self-defense to a person who initiated an assault).  In support of this claim, petitioner directs the court's attention to trial testimony by Ken Wilkins that after petitioner went out to his car, Wilkins obtained a knife from the kitchen and put it in the back of his pants in case petitioner came back to the restaurant with a gun.  (RT at 65-66.) Petitioner testified that when he returned to the pizza parlor, he noticed that Wilkins had a large knife in his belt.  According to petitioner, he ultimately left the store because Wilkins told him if he didn't leave, he was going to cut his throat.  (Id. at 166-167.)

This claim was raised for the first time in a petition for writ of habeas corpus filed in the California Superior Court.  (Answer, Ex. 5.)  The Superior Court denied the claim on the grounds that "petitioner could not explain why this issue could not have been brought up on appeal."  (Id. at consecutive p. 2.)  In a subsequent petition for writ of habeas corpus, the California Court of Appeal denied all of petitioner's claims with a citation to In re Hillery. (Answer, Ex. 6.)  The California Superior Court summarily denied all of petitioner's claims. (Answer, Exs. 6, 7.)  Under these circumstances, the court will review this claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003) (when it is clear that a state court has not reached the merits of a petitioner's claim, the AEDPA's deferential standard does not apply and a federal

1    habeas court must review the claim de novo); Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir.

2    2002) (AEDPA standard of review not applicable because state court did not reach the merits of

3    petitioner's perjury claim).  See also Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003)

4    (§2254(d) requires deference only to state court adjudication on the merits and not to a

5    disposition on procedural or other grounds); Neal v. Puckett, 286 F.3d 230, 235 (5th Cir. 2002)

6    (en banc) (defining "adjudication on the merits" to be a substantive, rather than a procedural,

7    decision); Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999) (court declined to apply deferential

8    AEDPA standard because of state court's awareness of, and explicit reliance on, a procedural

9    ground to dismiss petitioner's claim).

10          A challenge to jury instructions does not generally state a federal constitutional

11   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

12   U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

13   warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable,

14   erroneous, or even universally condemned, but must violate some due process right guaranteed

15   by the Fourteenth Amendment."  Prantil v. State of California, 843 F.2d at 317 (quoting Cupp v.

16   Naughten, 414 U.S. 141, 146 (1973)) (internal quotes omitted).  To prevail on such a claim

17   petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the

18   resulting conviction violates due process."  Prantil, 843 F.2d at 317 (quoting Darnell v. Swinney,

19   823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the

20   challenged jury instructions "in the context of the overall charge to the jury as a component of the

21   entire trial process."  Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where

22   the challenge is a failure to give an instruction, the petitioner's burden is "especially heavy,"

23   because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a

24   misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte

25   v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

26   /////

1   "The general principle is well established that a criminal defendant is entitled to

2   have a jury instruction on any defense which provides a legal defense to the charge against him

3   and which has some foundation in the evidence, even though the evidence may be weak,

4   insufficient, inconsistent, or of doubtful credibility." United States v. Escobar de Bright, 742

5   F.2d 1196, 1198 (9th Cir. 1984) (quoting United States ex rel. Peery v. Sielaff, 615 F.2d 402, 403

6   (7th Cir. 1979)). See also United States v. Sarno, 73 F.3d 1470, 1484 (9th Cir. 1995).  Failure to

7   give such a requested instruction is reversible error.  United States v. Rodriguez, 45 F.3d 302,

8   306 (9th Cir. 1995); United States v. Yarbrough, 852 F.2d 1522, 1541 (9th Cir. 1988).

9   Conversely, a defendant is not entitled to a jury instruction on a defense theory unless there is

10  some evidence before the jury to support it.  United States v. Bowman, 720 F.2d 1103, 1105 (9th

11  Cir. 1983).  A criminal defendant also has the right to have a jury resolve disputed factual issues.

12  United States v. Dorrell, 758 F.2d 427, 430 n.2 (9th Cir. 1985).  However, where the evidence,

13  even if believed, does not establish all of the elements of a defense, the trial judge need not

14  submit the defense to the jury.  Id. at 430.[8]

15          As discussed above, petitioner was convicted of two counts of making terrorist

16  threats, being a convicted felon in possession of a firearm, being a convicted felon in possession

17  of ammunition, and misdemeanor resisting arrest.  Petitioner does not explain why or how self-

18  defense would be a valid legal defense to these crimes.  Petitioner made his threats before he saw

19  Wilkins with a knife and he possessed the firearm and ammunition before he even reached the

20  pizza parlor.  Further, the evidence at trial did not demonstrate that petitioner defended himself

21  from an apparent imminent attack.  In fact, according to petitioner's testimony, he retreated from

22

23          [8] In California, the trial court has a sua sponte obligation to give instructions on a defense
    when (1) defendant is relying on the defense or (2) there is substantial evidence supportive of the
    defense and when the defense is not inconsistent with the defendant's theory of the case.  People
24  v. Barton, 12 Cal.4th 186 (1995).  To warrant a defense instruction, "the accused must present
    'evidence sufficient to deserve consideration by the jury, i.e., evidence from which a jury
25  composed of reasonable men could have concluded that the particular facts underlying the
    instruction did exist.'"  People v. Strozier, 20 Cal.App.4th 55, 63 (1993).
26

Wilkins without attempting to defend himself.  In short, there was insufficient evidence
presented at trial to support the giving of jury instructions on self-defense.  Petitioner's trial was
not rendered fundamentally unfair because of the trial court's failure to give these instructions,
nor was petitioner's counsel ineffective in failing to request them.  These claims should be
denied.

F.  Petitioner's Competence to Stand Trial (Claims 6/8 and 14/16)

Petitioner claims that he was not competent to stand trial and that the trial judge
erred in failing to hold a timely competency hearing.  After setting forth the applicable legal
principles, these separate but related claims will be analyzed below.

1.  Legal Standards

The conviction of a legally incompetent defendant violates the due process clause
of the Fourteenth Amendment.  Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Cacoperdo v.
Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994).  The test for competency is "whether the
defendant has sufficient present ability to consult with his lawyer with a reasonable degree of
rational understanding and has a rational as well as factual understanding of the proceedings
against him." Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362
U.S. 402, 402 (1960) ).  See also Douglas v. Woodford, 316 F.3d 1079, 1094 (9th Cir.), cert.
denied, ___U.S.___, 124 S. Ct. 49 (2003).

"In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the
issue of competency to stand trial if he presents sufficient facts to create a real and substantial
doubt as to his competency, even if those facts were not presented to the trial court." Deere v.
Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003) (quoting  Boag v. Raines, 769 F.2d 1341, 1343
(9th Cir. 1985).  See also Douglas, 316 F.3d at 1094.  A "good faith" or "substantial doubt"
exists in this regard  "when there is substantial evidence of incompetence." Deere, 339 F.3d at
1086 (quoting Cuffle v. Goldsmith, 906 F.2d 385, 392 (9th Cir. 1990)).  The burden of
establishing mental incompetence rests with the petitioner. Boag, 769 F.2d at 1343; McKinney

1   v. United States, 487 F.2d 948, 949 (9th Cir. 1973) ("[W]hen the issue of the defendant's

2   competency to stand trial is raised in a § 2255 motion, the burden is upon the defendant to prove

3   that he was not mentally competent to stand trial."); Lee v. United States, 468 F.2d 906 (9th Cir.

4   1972).

5           Whether a defendant is capable of understanding the proceedings and assisting

6   counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and

7   any prior medical opinions on competence to stand trial." Drope v. Missouri, 420 U.S. 162, 180

8   (1975). None of these factors is determinative, but any one of them may be sufficient to raise a

9   reasonable doubt regarding competence. Id. Finally, the due process clause requires a state trial

10  court to inquire into a defendant's competency sua sponte if a reasonable judge would be

11  expected to have a bona fide doubt as to the defendant's competence. Pate v. Robinson, 383 U.S.

12  375, 385 (1966); Blazak v. Ricketts, 1 F.3d 891, 893 & n.1 (9th Cir. 1993); United States v.

13  Lewis, 991 F.2d 524, 527 (9th Cir. 1993); Chavez v. United States, 656 F.2d 512, 515-17 (9th

14  Cir. 1981).[9]

15                          2. Trial Court's Failure to Hold Timely Competency Hearing (Claim 6/8)

16          Petitioner claims that the trial court erred in failing to hold a competency hearing

17  prior to the trial instead of holding a limited competency hearing after he had already been

18  convicted. (Am. Pet. at 19-21.) He argues, "the attempt and claim to declare the Petitioner

19  competent to stand trial, three months after his trial is illegal and impossible. . . competency to

20  stand trial in a criminal action must be determined before trial, not after." (Id. at 20.) Petitioner

21  contends that the trial judge, the prosecutor, and defense counsel were all aware prior to trial "of

22  the Petitioner's mental incompetence, and the fact that he was on heavy psychotropic

23  medications." (Id. at 19.) Petitioner argues that the trial judge should have been aware of his

24  incompetence because of "the voluminous evidence that the prosecutor and appointed counsel

25  _____

26          [9]  A state court's wrongful failure to hold a competency hearing can often be cured by
    holding one retroactively. Odle v. Woodford, 238 F.3d 1084, 1089 (2001).

1   were both aware of . . . petitioner's incompetency and heavy medications, but chose to ignore all

2   of it." (Id. at 20.)

3          This claim was raised for the first time in petitioner's application for a writ of

4   habeas corpus filed in the California Superior Court.  The Superior Court denied the claim with

5   the following language: "This issue, according to petitioner, was presented by attorney Eric A.

6   Berg in a motion for a new trial.  This matter seems to have been dealt with at the trial court level

7   prior to appeal." (Answer, Ex. 5 at consecutive pg. 3.)  The California Court of Appeals denied

8   all of petitioner's claims with a citation to In re Hillery, and the California Supreme Court

9   summarily denied petitioner's claims.  It is unclear whether the Superior Court denied this claim

10  on the merits or on purely procedural grounds.  However, the claim should be denied even under

11  a de novo standard of review.

12         As explained above, the trial court held a limited hearing into petitioner's

13  competence to stand trial after the trial was concluded.  Petitioner contends that the trial judge

14  should have determined his competency prior to the trial.  However, the evidence before the trial

15  judge at that time did not give rise to a bona fide doubt about petitioner's competence to stand

16  trial.  Petitioner did not exhibit irrational behavior, nor was the court confronted with any

17  evidence that raised a question as to petitioner's competence to stand trial.  Cf Blazak, 1 F.3d at

18  897 (competency hearing should have been conducted where state trial court had records

19  explaining defendant's extensive history of mental illness and previous adjudications of

20  incompetency, and there was no finding of competency at the time of defendant's trial); Chavez,

21  656 F.2d at 515 (evidentiary hearing required where petitioner had a history of antisocial

22  behavior and treatment for mental illness, petitioner had several emotional outbursts in court,

23  there was a previous psychiatric finding of insanity based upon psychoneurosis and the use of

24  drugs, and an inference that petitioner had not even attempted to plea bargain).  Although

25  petitioner's trial counsel and the prosecutor were apparently aware petitioner was taking

26  psychotropic medication before trial commenced, this fact alone does not mandate a competency

21

1    hearing.  There is no evidence that either attorney perceived petitioner was suffering ill effects

2    from his medications or was otherwise unable to comprehend the proceedings, and no party

3    raised a question as to petitioner's competency during trial.  See United States v. Lewis, 991 F.2d

4    524, 528 (9th Cir. 1993) (a defense counsel's silence on the petitioner's competency is some

5    evidence that the petitioner showed no signs of incompetence at that time).  See also Medina v.

6    California, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-informed view of

7    the defendant's ability to participate in his defense").  Indeed, at the hearing on petitioner's

8    motion for a new trial, petitioner's trial counsel testified that although petitioner was extremely

9    anxious about the upcoming trial and his possible Three Strikes sentence, counsel "never had any

10   question or thought . . . that [petitioner] was not competent to stand trial."  (RT at 405.)

11   Similarly, the trial judge noted in a ruling in connection with petitioner's motion for new trial

12   that "the court has not observed any behavior of the defendant at any time that would cast doubt

13   on his present mental competence."  (CT at 501.)

14          Under the circumstances presented here, the trial court had no reason to doubt

15   petitioner's competence.  Accordingly, petitioner's claim that the trial court had a duty to conduct

16   a sua sponte competency hearing prior to trial should be denied.

17          3.  Whether Petitioner was Competent to Stand Trial (Claim 14/16)

18          Petitioner also claims that he was not, in fact, competent to stand trial.  In support

19   of this claim, petitioner directs the court's attention to evidence in the state court record

20   concerning his mental health problems while he was in jail awaiting trial.  (Request for the Court

21   to take Judicial Notice of Illegal Acts of the Respondent (Request for Judicial Notice), filed June

22   19, 2000, Ex. A at pgs. 128-215.)

23          The record contains evidence that petitioner received medical care and was

24   prescribed medication for mental health problems at the jail prior to his trial.  The record also

25   /////

26   /////

22

reflects that petitioner went on several hunger strikes and threatened suicide.[10]  However, the evidence does not establish that petitioner was incompetent to stand trial.  Petitioner's hunger strikes and suicide threats prior to trial, while serious, do not demonstrate that petitioner was unable to understand the proceedings or to help his trial counsel with the defense.  Instead, the evidence before this court indicates that petitioner was acutely aware of his situation and the sentence he faced, and that this awareness fueled his anxiety and depression.  Further, there was testimony at the motion for new trial that petitioner may have been fabricating his symptoms in order to retaliate against the County for prosecuting him.  (RT at 448, 460, 479, 482.)  The physician who initially diagnosed petitioner with post-traumatic stress disorder later came to believe petitioner was malingering and inventing symptoms.  This same physician also concluded that "[petitioner] had the capacity to participate in his legal defense."  (Exhibit A to Request for Judicial Notice, at p. E-131.)  Likewise, petitioner has failed to demonstrate that his childhood history of physical and emotional abuse caused any mental impairment at the time of his trial. See Chavez, 656 F.2d at 518 ("evidence of possible present incompetence, such as a history of

/////

---

[10]   The record reflects that petitioner was transferred from the jail to the Trinity Hospital for medical treatment after he initiated a hunger strike and threatened to commit suicide if he received a lengthy sentence.  (Exhibit A to Request for Judicial Notice at p. E-129.)  The record also reflects that at the hospital, petitioner was seen by Mr. Strickler, a clinical social worker, who

> noted that if [petitioner] were medically clear, he would advise that the jail initiate Penal Code section 4011.6 (transfer of prisoner for evaluation of mental disorder) proceedings and that [petitioner] be sent to Shasta County jail for psychiatric treatment.  Mr. Strickler recommended that once Mr. Brown's medical crisis was settled, he be transferred to a facility he could get appropriate long-term psychiatric treatment for his Post-Traumatic Stress Syndrome and depression, then legal proceedings could follow.  (TCCC Progress Note 10/3/96.)  It should be noted that the jail did not follow Mr. Strickler's recommendation and that [petitioner] was never transferred to another facility for evaluation of his mental disorder.

(Id., at E-130.)

1  psychiatric problems in the remote past, may be so overshadowed by other evidence of present

2  competence that it does not demand further investigation at an evidentiary hearing").

3        The record before the court reflects that petitioner's trial proceeded without

4  incident and without any discussion or questioning of petitioner's competence.  Petitioner took

5  the witness stand in his own defense and answered the questions put to him on both direct and

6  cross-examination in a logical, consistent manner.  As explained by one court, "[i]n cases finding

7  sufficient evidence of incompetency, the petitioners have been able to show either extremely

8  erratic and irrational behavior during the course of the trial . . . or lengthy histories of acute

9  psychosis and psychiatric treatment . . . ."  Boag, 769 F.2d at 1343 (citations omitted).  Although

10 the record reflects petitioner's history of psychiatric problems, he has not cited, nor does the

11 record reflect, any instances of irrational behavior or expression of confusion on his part during

12 the trial itself.  See Douglas, 316 F.3d at 1094 (noting that petitioner did not exhibit any strange

13 behavior in the courtroom in concluding that petitioner had failed to raise a real and substantial

14 question regarding his competence to stand trial).

15        The fact that petitioner was taking medication at the time of trial, standing alone,

16 does not establish that he was incompetent, nor does it raise a "bona fide doubt" as to his

17 competence to stand trial.  As one court has observed, "[p]sychotropic drugs are intended to

18 restore competence, and while they are not always successful in doing so, use of psychotropic

19 medication is evidence only of mental illness, not that the illness rendered the person

20 incompetent."  Thirkield v. Pitcher, 199 F. Supp. 2d 637, 652 (E.D. Mich. 2002).  See also

21 Sturgis v. Goldsmith, 796 F.2d 1103, 1109-10 (9th Cir. 1986) (failure to present evidence of

22 medication petitioner was taking or "how [the medication] might have affected his competence at

23 trial" failed to raise a bona fide doubt as to the petitioner's competency to stand trial); United

24 States v. Williams, 998 F.2d 258, 267 (5th Cir. 1993) ("[e]ven if true, the bare allegation that he

25 has seen a psychiatrist and taken psychotropic medication, without more, would not suffice to

26 establish reasonable grounds to believe that Williams might be so mentally compromised as to be

24

1  unable to understand trial proceedings or to assist in his own defense.").  There is no evidence

2  that petitioner complained of suffering any side effects from medication either prior to or during

3  his trial.

4        In presenting this claim, petitioner points to several parts of the trial record which,

5  when taken out of context and viewed in isolation, tend to paint a dire picture of petitioner's

6  emotional state prior to trial.  However, when viewed as a whole, there is no significant evidence

7  that petitioner was incompetent to stand trial, as defined by the federal cases cited above.

8  Accordingly, this claim should be denied.

9        G.  Shackling (Claim 7/9)

10       Petitioner claims his right to a fair trial was violated when, in full view of the jury,

11  who were just about to begin deliberations for that day, he was delivered in handcuffs and leg

12  shackles to the courthouse by armed Sheriff's deputies in an armored van.  Petitioner argues that

13  this incident left the impression in the jurors' minds that he was "a violently dangerous criminal"

14  and needed "restraints and armed Deputies to protect the public from him."  (Am. Pet. 2 at 23.)

15  He argues, "the prosecution team (Trinity County Sheriff's) vindictively and intentionally

16  prejudiced the Petitioner, because the Sheriff's Officers could see that the jury was in the

17  hallway, but continued to remove him from the van and drag him past the jury in chains and

18  handcuffs in order to create the impression of a dangerous, guilty man, thereby insuring a guilty

19  verdict."  (Id. at 30.)  Petitioner contends there was no need for shackles because he was a "quiet

20  and courteous defendant."  (Id.)  Petitioner also argues that he suffered prejudice because prior to

21  this incident the deliberating jurors had requested "numerous items of evidence, testimony and

22  police reports," but after they saw petitioner in shackles they "withdrew all requests and quickly

23  reached a guilty verdict."  (Id. at 22.)

24       This claim was raised for the first time in petitioner's application for a writ of

25  habeas corpus filed in the California Superior Court.  The Superior Court denied the claim on the

26  grounds that it was or should have been raised and considered on direct appeal.  (Answer, Ex. 5

at consecutive pgs. 2, 3.)  The California Court of Appeals denied all of petitioner's claims with a

citation to In re Hillery, and the California Supreme Court summarily denied petitioner's claims.

Under these circumstances, the court will review this claim de novo.  Nulph, 333 F.3d at 1056

(9th Cir. 2003); Killian, 282 F.3d at 1208.

> The facts surrounding this claim and petitioner's next claim are the following:

> THE COURT:  Back on the record.

> Although Mr. Mock just stepped out of the courtroom, Mr.
> Dippery has informed me that Mr. Brown – and they are both
> present – Mr Brown would waive his presence for me to excuse the
> jury at the end of this day if that's all we're going to do.  And that
> will just be excusing them to go home for the evening with the
> usual admonitions about not talking about the case.  And also they
> would be directed, Mr. Brown, to reassemble on their own in the
> morning at whatever time they pick.  It will probably be nine
> o'clock or thereabouts.  And then they start up their deliberations
> again in the morning without having to come into the courtroom.  I
> will explain all of that to them.

> THE DEFENDANT:  Okay.  They won't be mad at me for going
> and eating my dinner while they had to stay, will they?

> THE COURT:  Well, I'm not a mind reader.  I can't tell you what
> they will or won't think.

> THE DEFENDANT:  Okay.

> THE COURT:  If you want that procedure, that's fine.  If you
> don't, it's –

> THE DEFENDANT:  I'll waive it, your honor.

> THE COURT:  – no difficulty to have you brought back.

> THE DEFENDANT:  I'll waive it.

> THE COURT:  All right.

> THE COURT: All right.  All twelve jurors are with us.
> On the record in People versus Brown.

> The defendant isn't present.  His attendance was excused earlier.

> As you can see, we have changed clerks and things start changing
> after five.

I have your original handwritten questions. I think the bailiff probably brought in some forms that we usually use. You may not have to deal with those forms.

We've just now got the packet of instructions ready for you. So that [sic] can go in next time you go in the jury room.

I thought the verdict forms would be ready. They are not quite ready. That's not the responsibility of anybody here so – but anyway, things are working.

Let me respond to your questions. And I'm doing so after having already talked to the attorneys about them.

First, with regard to the list of charges. Once you get the instructions and the verdict forms, I think that will take care of that item. So let's just see if that doesn't satisfy you.

Wilkins' written statement and Burgesses report. Those aren't in evidence. And you'll recall – we've been harping on this principle of law all week long – that you only consider what's in evidence. Sometimes pieces of paper are received in evidence and sometimes they aren't. That depends a great deal on how the rules of evidence apply to reports and that sort of thing that come up that are mentioned during the course of the trial. So you won't have the text of those reports.

Testimony of the pizza parlor employees. Terry Moore has that marked. He can start reading it at any time. It will take at least an hour, more likely an hour and a half for that to be done.

Who is the foreperson?

JUROR NUMBER SEVEN: I am.

THE COURT: Mr. ____. Okay. As I talk to you now and ask for some feedback, be careful, both Mr. ___, as foreperson, and the rest of you to only answer the questions that I'm asking. Don't go beyond what I'm asking for. If there's any doubt in your mind as to what I'm asking for, ask me to clarify. We need to take these in baby steps one at a time.

First of all, in terms of where we go from right now. Mr. ___, I sort of laid down the rule about you'll go until six o-clock. And I'm probably not going to let you go past that. Do you feel as foreperson that the jury as a whole has a burning desire to keep deliberating tonight?

JUROR NUMBER FOUR: I don't think the jury as a whole does, no.

27

1   THE COURT:  Okay.  Now, real – I decide it; so you vote any way
    you want.  How many would like to keep going tonight for at least
2   another half an hour?

3   And how many would just as soon pick it up in the morning, leave
    now and pick it up in the morning?
4
    Okay.  We have a majority there that would just as soon keep going
5   at least a half an hour.

6   Do you understand that you're going to be coming back to hear the
    testimony tomorrow if your request remains out.  Unless you
7   withdraw that request, you'll be hearing the testimony.  We don't
    have time enough here to hear the testimony tonight.
8
    For those who want to stay, would it be your request to keep
9   deliberating rather than listening to the reread?  If yes, raise your
    hand.
10
    All right.  Fine.  I think you're earned that.  Let's keep deliberating.
11  It was eight to four, roughly, wanted to keep working just another
    half hour and then we call it.
12
    For those who are traveling, especially over south fork, I realize
13  that it's hard to rearrange things, but if you want to be put up in a
    motel here in Weaverville to help reduce the inconvenience, let the
14  bailiff know and we'll take care of it.

15  Okay.  That's it.  Back to the jury room.

16  Yes, Miss ____?

17  MS. _____:  How early in the morning?

18  THE COURT:  We can get that – let's get that sorted out now.
    Your pick, whatever you folks want.  I'd say we'd start off with a
19  presumption that it would be nine o-clock.

20  Now, how many want earlier than nine?  Most.  Good.

21  Anybody for eight?  Most.  That's fantastic.

22  Okay.  that's great.  I can't do it before eight.  It's clumsy because
    of the opening of the building and everything.
23
    Okay.  Here's what we can do.  You can keep going on your own
24  this evening without coming back into the courtroom.  And you're
    going to split up in half an hour, okay?  I do not want a majority to
25  try to strong-arm the others into staying later than that.  If you – if
    you're all twelve right in mid-sentence and you happen to stay
26  thirty-five or forty minutes, that's up to you.  But you get my drift?

28

1      Anybody has a right to leave after half an hour, and if so, you all
       leave.  Is that clear enough to you, Mr. ___?
2
       JUROR NUMBER FOUR:  (Nods head.).
3      THE COURT:  All right.  I hope so.

4      Then you reassemble on your own tomorrow.  Eight o'clock.

5      Remember, that as soon as you split up, the admonition kicks back
       in and you can't be exposed to any information about the case.  Of
6      course, your minds keep working, but you can't talk about it to
       anybody.  And when you're all twelve back in the jury room
7      tomorrow, you can start discussing it right at eight o'clock sharp.

8      Any questions on that sequence?

9      JUROR NUMBER FOUR:  The earliest I can be here is eight
       fifteen because I let my daughter catch the bus.  The bus doesn't
10     get there until seven thirty, and forty-five minutes is about it for me
       to drive the mountain.  I can be here at eight fifteen.
11
       THE COURT:  Is there anybody who could take care of getting
12     your daughter to the bus?

13     JUROR NUMBER FOUR:  No.  My husband is in the bay area
       working, and we're the only kids on the road now.  She's the
14     youngest one on our road.  That's my problem.  I can be here at
       eight fifteen.
15
       THE COURT:  Is there somebody's house that you could drop her
16     off at elsewhere?

17     JUROR NUMBER FOUR:  I can call around and see if I can find
       somebody.
18
       THE COURT:  Are you willing to try?
19
       JUROR NUMBER FOUR:  Yeah, I'm willing to try.  But my
20     concern is getting her on – you know, she can take the bus to
       school; I don't have to drive her, but the bus doesn't get there until
21     seven thirty.  But I can – I'll see if I can find somebody that –

22     THE COURT:  Yeah, if you could drop her off at somebody else's
       house –
23
       JUROR NUMBER FOUR:  Okay.
24
       THE COURT:  – where the bus is going to pick up.
25
       Okay.  Any other questions?  I'm sure you'll find eleven very
26     understanding people if you're late.

                                   29

1    JUROR NUMBER TEN.  I have a question.  Are we going to get
     the jury instructions tonight or –
2
     THE COURT:  I don't know.  I'm not sure what the holdup on that
3    is.  That's not part of what I was working on.  Don't blame
     anybody.  It's just that we don't have – oh, the instructions, yeah.
4    Right now.  Sorry.  The verdict forms, don't know.  The bailiff will
     bring them into [sic] you right now.
5
     Okay.  Back to work.  Everybody has a veto right to quit after half
6    an hour.  If nobody really wants to stay beyond then, that is what
     you're supposed to do.  You reassemble on your own tomorrow
7    under the instructions that I have given.

8                    (JURORS EXIT COURTROOM.)

9              (THE FOLLOWING PROCEEDINGS ENSUED
                OUTSIDE THE PRESENCE OF THE JURY)
10
     THE COURT:  It just occurred to me, counsel, that defendant
11   waived his presence for the jury to be excused for the evening.  I
     did go beyond that.  Stipulate?
12
     MR. DIPPERY:  I think it's within the spirit of what Mr. Brown
13   intended.

14   THE COURT:  Okay.  Well, help me remember to put that on the
     record tomorrow.  I agree with you wholeheartedly.  But I really – I
15   literally went beyond what I told him I was going to do without
     him here.
16

17   (RT at 337-43.)  The jury continued deliberating that evening until approximately 6:45 p.m.  (Id.

18   at 337b.)

19          The next morning, the jury reconvened at approximately 8:00 a.m.  (Id.)  The trial

20   judge told petitioner what had occurred outside his presence the previous evening in the jury

21   room.  (Id. at 335b -37b.)  Petitioner's trial attorney then informed the court that petitioner

22   "brought up that apparently he was brought in this morning while all the jurors – or at least most

23   of them were in the hallway.  They saw him in handcuffs.  They saw him get out of the Sheriff's

24   van."  (Id. at 338.)  Petitioner's counsel requested that the court admonish the jurors that

25   petitioner had been custody since his arrest and that "they're not to consider that."  (Id.)  The

26   prosecutor concurred in this request and the judge agreed to so advise the jury.  (Id.)  The trial

                                          30

judge then noted that the jury had resumed deliberations the night before without the re-read of

testimony.  (Id. at 339b.)  The bailiff informed the judge that "the foreman said they did not need

a reread."  (Id.)  At this point, the trial judge went into the jury room and spoke to the jurors.  (Id.

at 341b.)  After he came out, the judge described to petitioner and all counsel what he had said to

the jurors, as follows:

> The defendant is present.  Both attorneys are present.  The jury is
> still in deliberations.
>
> Since we were last on the record, the attorneys and I talked about
> information that came from one of the custodial officers, or
> perhaps jurors – custodial officer.  No, the defendant, that was it.
>
> The defendant had told his attorney that he thought some jurors
> may have – may well have seen him being transported in custody
> and brought into the courthouse in custody.  And then the attorneys
> agreed that I should go into the jury room and explain the
> following, which I did.
>
> First, that I understood that one or more of you jurors might have
> seen Mr. Brown in a custodial status, perhaps moving into the
> courthouse this morning.  It was a fact, indeed, that he had been in
> custody since the date of his arrest, since late August of last year,
> and that that fact should not in any way influence the manner in
> which they approach their task and decision making in the case.
>
> I also at that time explained to them that – well, I apologized for
> the lack of the verdict forms at that point in time, which was
> probably eight thirty, quarter to nine, something like that.  It is now
> ten to ten.  And I explained that – I may well have said that the
> D.A.'s office was in the process of preparing them, but I followed
> with the comment that I apologized for the delay.  And the fact of
> the delay obviously shouldn't affect them in any way with regard to
> their decision making process.
>
> Also, while neither I nor the attorneys nor the defendant were in
> the courtroom, an additional bailiff was sworn by the clerk.
>
> The Marshal explained to me that it was – that was needed because
> they had too many bases to cover, and Heather was sworn by
> Shelly Razo, I think.

/////

/////

/////

1
2

> Lastly, and I think we've already hit this nail at least once, the
> bailiff informed me that the foreman had informed him that the
> jury did not want a reread this morning.

3  (Id. at 340b-42b.)  The jury presented its verdict at 10:30 a.m. that morning  (CT at 48.)

4        To protect the right to a fair trial, criminal defendants have "the right to be free of

5  shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential

6  state interest."  Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002).  See also  Rhoden v.

7  Rowland, 172 F.3d 633 (9th Cir.1999) (prejudice shown where defendant shackled during entire

8  trial).  In order for a defendant to prevail on the merits of a claim based upon shackling, the court

9  must find that the defendant was physically restrained in the presence of the jury, the shackling

10 was seen by the jury, and the physical restraint was not justified by state interests.  Dylas v.

11 Poole, 317 F.3d 934 (9th Cir. 2002); Ghent, 279 F.3d at 1132.  See also Deck v. Missouri, 544

12 U.S. 622, 125 S.Ct. 2007, 2009 (2005) (in a capital case, the Constitution forbids the use of

13 visible shackles during the penalty phase, as well as the guilt phase, unless that use is justified by

14 an essential state interest, specific to the defendant on trial.)

15       Shackling a criminal defendant is "inherently prejudicial."  Deck, 125 S. Ct. at

16 2011 (quoting Holbrook v. Flynn, 475 U.S.560, 568 (1986)).  "Thus, the Fifth and Fourteenth

17 Amendments prohibit the use of physical restraints visible to the jury absent a trial court

18 determination, in the exercise of its discretion, that they are justified by a state interest specific to

19 a particular trial.  Deck, 125 S.Ct. at 2012.  However, a jury's brief or inadvertent glimpse of a

20 defendant in physical restraints outside of the courtroom is not inherently or presumptively

21 prejudicial.  See e.g., Ghent, 279 F.3d at 1132 (jurors' view of defendant in the hallway and

22 being transported in restraints on several occasions not unduly prejudicial); United States v.

23 Olano, 62 F.3d 1180, 1190 (9th Cir.1995) (same).  In cases where jurors observe a defendant in

24 shackles outside of the courtroom, actual prejudice must be demonstrated.  Wilson v. McCarthy,

25 770 F.2d 1482, 1485-86 (9th Cir.1985) (a jury's brief, inadvertent observation of a defendant in

26 /////

1  custody does not compel reversal in the absence of an affirmative showing of actual prejudice);

2  United States v. Halliburton, 870 F.2d 557, 560-61 (9th Cir.1989) (same).

3                Petitioner's jury viewed him in restraints outside the courtroom on one occasion.[11]

4  The jurors were immediately admonished that petitioner had been in custody since his arrest and

5  that they should not consider that fact in rendering a verdict.  Under these circumstances, the

6  prejudice to petitioner from being seen in restraints was greatly reduced, if not entirely

7  eliminated.  See United States v. Acosta-Garcia, 448 F.2d 395, 396 (9th Cir.1971) ("the mere

8  fact that some prospective members of the jury may have seen appellants in handcuffs is not so

9  prejudicial as to require a mistrial, ⋯ particularly where, as here, the trial court took great pains

10 to explain that this occurrence was to have no bearing on the jury's consideration of the merits of

11 the case against appellants"); Dupont v. Hall, 555 F.2d 15, 17 (1st Cir.1977) (noting that even the

12 "most unsophisticated juror" knows that defendants may have to post bail and that some lack the

13 resources to do this); Wright v. Texas, 533 F.2d 185, 188 (5th Cir.1976) (observing that "rational

14 jurors would understand and follow a proper instruction that handcuffing persons in custody for

15 transportation to and from the courtroom is a reasonable precaution that in no way reflects upon

16 the presumption of innocence or the individual propensities of any defendant"); United States v.

17 Leach, 429 F.2d 956, 962 (8th Cir.1970) ("[i]t is a normal and regular as well as a highly

18 /////

19

20        [11]  In the amended petition, petitioner states that he was forced to wear leg restraints
    throughout the trial that "the jury saw and were obvious" and was "forced to shuffle to the
21  witness stand while restrained, in full view of the jury."  (Id. at 25, 26.)  Petitioner does not cite
    any portion of the state court record in support of this claim and does not elaborate on it in the
22  amended petition or in the traverse.  At the hearing in this court on petitioner's motions for
    discovery, discussed below, petitioner's counsel was not able to confirm that petitioner was
23  shackled during trial.  Further, petitioner's alarm after he realized the jurors had seen him in
    shackles in the hallway suggests that this was the first time the jurors had seen his restraints.
24  Petitioner's unsubstantiated and conclusory allegations that he was shackled during trial cannot
    support his due process claim that he suffered prejudice when the jury saw him in shackles
25  outside the courtroom and do not give rise to a separate claim that he was improperly shackled at
    trial.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20,
26  26 (9th Cir. 1994) ("It is well-settled that '[c]onclusory allegations which are not supported by a
    statement of specific facts do not warrant habeas relief'")).

desirable and necessary practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this").[12]

Petitioner's contention that the jurors withdrew their requests to review the record and for a re-read of testimony, and immediately reached a verdict simply because they saw him in handcuffs, is belied by the record.  As set forth above, part of the information requested by the jurors was not in the record and was therefore unavailable for their review.  Further, the jurors continued deliberating without hearing the re-read when they were informed that it could not be accomplished until the next morning.  Apparently, the jury was able to reach a verdict without hearing the trial testimony for a second time.  Finally, the jurors took at least three hours to reach a verdict after seeing the petitioner in shackles.

Petitioner has failed to make an affirmative showing that actual prejudice resulted from the jury's brief and inadvertent observation of him in restraints.  The jury's view of petitioner being transported to the courtroom in shackles did not have "substantial and injurious effect or influence in determining the jury's verdict."  <u>Rhoden</u>, 172 F.3d at 637 (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  Accordingly, this claim should be denied.

H.  <u>Trial Court's Interaction with Jurors/ Right to be Present (Claim 8/10)</u>

Petitioner claims that the trial judge violated his constitutional right to a fair trial when he engaged in the above-described ex-parte discussions with the deliberating jurors.  (Am. Pet. at 31-36.)  Petitioner also argues that the judge's actions deprived him of the opportunity to be present at a critical phase of the proceedings.  (<u>Id.</u> at 88-94.)  He contends that the jurors' continued deliberations after he thought they were going home for the night constituted an unlawful continuation of the trial out of his presence.

/////

---

[12]  There is no evidence that the incident in which the jurors saw petitioner in shackles in the hallway was "a staged act by the agents of the prosecutor to portray the Petitioner as a dangerous and guilty man," as alleged by petitioner.  (Traverse at 26.)

1    Petitioner raised this claim for the first time in his petition for writ of habeas

2  corpus in the California Superior Court.  The Superior Court denied the claim on the grounds that

3  "if this ground was meritorious it could have been presented upon appeal."  (Answer, Ex. 5 at

4  consecutive p. 3.)  The California Court of Appeals denied all of petitioner's claims with a

5  citation to In re Hillery, and the California Supreme Court summarily denied petitioner's claims.

6  Under these circumstances, the court will review this claim de novo.  Nulph, 333 F.3d at 1056

7  (9th Cir. 2003); Killian, 282 F.3d at 1208.

8    A criminal defendant has a right to be present at any stage of the criminal

9  proceeding that is critical to its outcome if his presence would contribute to the fairness or

10  reliability of the procedure.  Kentucky v. Stincer, 482 U.S. 730, 745 (1987); United States v.

11  Gagnon, 470 U.S. 522, 527 (1985) (per curiam) (defendants' absence did not violate the Due

12  Process Clause where their presence was not needed to "ensure fundamental fairness" and they

13  could not have added to or gained from being present at the conference); Campbell v. Rice, 408

14  F.3d 1166 (9th Cir. 2005) (violation of petitioner's due process rights by his exclusion from

15  private in-chambers hearing where the trial court concluded that his attorney did not have a

16  conflict of interest was harmless error).  The right to be present, like many other constitutional

17  rights, may be waived.  See Gagnon, 470 U.S. at 529; Taylor v. United States, 414 U.S. 17, 19-20

18  (1973); Hayes v. Woodford, 301 F.3d 1054, 1078 (9th Cir. 2002); Brewer v. Raines, 670 F.2d

19  117, 119 (9th Cir. 1982).  Further, the right to be present during all critical stages of the

20  proceedings is subject to harmless error analysis.  Campbell, 408 F.3d at 1172.

21    Petitioner waived the right to be present during the two above-described ex parte

22  meetings between the trial judge and the jury.  Petitioner's trial counsel agreed that the discussion

23  during the first such meeting was "within the spirit" of petitioner's waiver of his right to be

24  present for the duration of that day's events.  With regard to the second meeting, petitioner's

25  counsel agreed that the trial judge could speak to the jury outside the presence of petitioner or his

26  counsel.

1    Even if petitioner did not waive the right to be present during these discussions

2    between the judge and the jurors, any error was harmless.  There is no evidence that petitioner's

3    presence would have contributed to the fairness or reliability of the discussions or that his

4    absence contributed to any unfairness.  The transcript of the first meeting reflects that the judge

5    merely arranged for the jury to hear a read-back of testimony and discussed the timing of further

6    deliberations.  Although the jurors chose to deliberate for an additional half-hour instead of

7    immediately retiring for the day, there is no indication that petitioner's continuing presence in the

8    courtroom while the jury was deliberating in another room was necessary to ensure a fair trial.

9    Indeed, petitioner does not articulate any objections to the substance of the judge's remarks.

10    The second meeting was not transcribed.  However, the judge and all counsel

11    agreed in advance to the substance of the judge's communication to the jurors and the judge

12    represented that his remarks were consistent with that agreement.[13]  The matters discussed were

13    relatively straightforward and uncontroversial and did not drift into any other topic.  Cf. United

14    States v. United States Gypsum Co., 438 U.S. 422, 462 (1978) (the Supreme Court commented

15    that a private untranscribed meeting between a trial judge and a juror was undesirable, but

16    standing alone was not error).  Further, none of the parties voiced any objection to the judge

17    conducting an ex parte meeting with the jurors to convey the stipulated information.

18    Petitioner argues that he suffered prejudice because "the petitioner was portrayed

19    to the jury as arrogant and disrespectful towards the jury, by not even attending his own jury

20    trial."  (Am. Pet. at 91.)  This court disagrees that petitioner's decision to eat dinner at the end of

21    the day instead of waiting while the jurors deliberated in another room indicated disrespect to the

22    jury.  No rational juror would have construed petitioner's decision in that way.  Under the

23    circumstances, this court concludes that the judge's ex parte communications with the jurors did

24

25    [13] Petitioner complains that he should not have to rely on the judge's representations as to
26    what was said.  However, there is no evidence in the record that the trial judge misrepresented to
the parties what occurred in the jury room and this court rejects any such suggestion.

36

1    not violate petitioner's right to be present at a critical state of the proceedings or his right to a fair

2    trial.  Accordingly, these claims should be denied.

3         I.  Prosecutorial Misconduct (Claim 9/11)

4              Petitioner argues that the prosecutor committed misconduct by "forcing petitioner

5    to characterize all the witnesses, including police officers as liars."  (Am. Pet. at 37.)  In support

6    of this claim, petitioner points to numerous instances in the record where the prosecutor asked

7    petitioner on cross-examination if the prosecution witnesses were lying when they testified in a

8    manner that differed from petitioner's testimony.  (See e.g., RT at 211, 218-20, 229, 231, 240.)

9    In all instances, petitioner answered that the witnesses were lying, that they were mistaken, or

10   that he did not know whether they were lying.  (Id.)  Respondent concedes that the prosecutor's

11   questions in this regard constituted misconduct.  See United States v. Sanchez, 176 F.3d 1214,

12   1218-21 (9th Cir. 1999) (holding that it is error for a prosecutor to force a defendant to call a

13   prosecution witness (in that case, a United States Marshal) a liar because opinion evidence

14   regarding a witness' credibility is inadmissible).

15             This claim was raised for the first time in petitioner's application for a writ of

16   habeas corpus filed in the California Superior Court.  The Superior Court denied the claim on the

17   basis that "the facts which allegedly support this allegation are set forth in the transcript and were

18   subject to appeal."  (Answer, Ex. 5 at consecutive p. 3.)  The California Court of Appeals denied

19   all of petitioner's claims with a citation to In re Hillery, and the California Supreme Court

20   summarily denied petitioner's claims.  Under these circumstances, the court will review this

21   claim de novo.  Nulph, 333 F.3d at 1056 (9th Cir. 2003); Killian, 282 F.3d at 1208.

22             "A defendant's due process rights are violated if prosecutorial misconduct

23   renders a trial 'fundamentally unfair.'"  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)

24   (quoting Darden v. Wainwright, 477 U.S. 168, 183 (1986)).  According to the United States

25   Supreme Court, "the touchstone of due process analysis in cases of alleged prosecutorial

26   misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips,

455 U.S. 209, 219 (1982).  Thus, the federal habeas court must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974).

Petitioner has failed to demonstrate that the prosecutor's improper cross-examination questions rendered his trial fundamentally unfair.  The prosecutor was apparently trying to emphasize the obvious point that petitioner's testimony differed in material respects from nearly all the other witnesses present at the scene.  The jurors had heard the same evidence and were therefore in a position to draw their own conclusions from the discrepancies.  "Pointing out the obvious most likely scored the government, at most, rhetorical points."  United States v. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996) (prosecutor's question to defendant whether another witness had lied was harmless error).  In addition, as pointed out by respondent, the prosecutor would have been entitled to argue in his closing argument that "the only way one could accept Petitioner's testimony was to call all the prosecution witnesses liars."  (Answer at 38.)  Such an argument would not have been improper.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.1999) (during closing argument a prosecutor may label a witness's testimony as lies or fabrication).  Because petitioner has failed to demonstrate prejudice, he is not entitled to relief on this claim.

J.  Detention as a Pre-Trial Detainee (Claim 10/12)

Petitioner claims that he was subjected to improper punishment while he was a pretrial detainee, in violation of his Fourteenth Amendment right to due process, First Amendment right to freedom of speech, and Fourth Amendment right to be free from unreasonable searches and seizures.  (Am. Pet. at 45-49.)  Specifically, petitioner alleges that he was punished for talking to other inmates about "the law" and their legal rights, that prison officials read his "legal casework," and that he was inappropriately transferred to state prison where he was unable to work on his case.  Petitioner also alleges that his detention interfered with his ability to consult with his trial attorney and prepare for his upcoming trial.

1          When a prisoner challenges the fact or duration of his custody and a determination

2  of his action may result in plaintiff's entitlement to an earlier release, his sole federal remedy is a

3  writ of habeas corpus.  Preiser v. Rodriguez, 411 U.S. 475 (1973); Young v. Kenny, 907 F.2d

4  874 (9th Cir. 1990), cert. den., 493 U.S. 1126 (1991). The proper mechanism for raising a federal

5  challenge to conditions of confinement, however,  is through a civil rights action pursuant to 42

6  U.S.C. § 1983.  Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991).  Petitioner's allegations in this

7  regard concern the conditions of his confinement and not the fact or duration of his custody.

8  Therefore, they may not be pursued in this habeas corpus proceeding.

9          Even assuming arguendo that these claims are appropriately raised in this federal

10  habeas corpus action, they should be denied.  Petitioner has failed to demonstrate that the actions

11  of prison officials violated his due process rights, rendered his trial fundamentally unfair, or

12  constituted cruel and unusual punishment.  See Jones, 66 F.3d at 204 (holding that conclusory

13  allegations which are not supported by a statement of specific facts do not warrant habeas relief).

14  There is also no evidence that petitioner's confinement or his treatment while in confinement

15  impaired his right to access the courts in any significant way.  To the extent petitioner's

16  allegations contained in this claim are relevant to his claims of incompetence to stand trial,

17  ineffective assistance of counsel, or any other claim appropriately raised in this habeas corpus

18  proceeding, they will be addressed in connection with this court's discussion of those claims.[14]

19      K.  Outrageous Government Conduct (Manufactured Evidence) (Claim 11/13)

20          Petitioner was charged with a violation of Cal. Pen. Code § 422, which provides,

21  in relevant part:

22                  Any person who willfully threatens to commit a crime which will

23                  result in death or great bodily injury to another person, with the
                      specific intent that the statement, made verbally, in writing, or by

24

25          [14]  Petitioner may be claiming that he was inappropriately placed in a state prison while he
  was still a pretrial detainee instead of being confined in a jail or other location.  (See e.g., Am.

26  Pet. at 2.)  Any such claim is not cognizable in a federal habeas corpus petition.  The placement
  of state prisoners is a matter for state authorities to decide.

> means of an electronic communication device, is to be taken as a
> threat, even if there is no intent of actually carrying it out, which,
> on its face and under the circumstances in which it is made, is so
> unequivocal, unconditional, immediate, and specific as to convey
> to the person threatened, a gravity of purpose and an immediate
> prospect of execution of the threat, and thereby causes that person
> reasonably to be in sustained fear for his or her own safety or for
> his or her immediate family's safety, shall be punished by
> imprisonment in the county jail not to exceed one year, or by
> imprisonment in the state prison.

Petitioner claims that the police officer who searched his vehicle deliberately "manufactured evidence" to support several of the required elements of this charge.  Specifically, petitioner contends that the officer himself instilled fear and a sense that petitioner intended to and could immediately carry out his threats when he informed the pizza parlor employees that there was a gun in petitioner's car.  Petitioner argues that, before they were so informed, the employees did not believe that petitioner had any intention of actually harming them.  Petitioner explains:

> The evidence clearly shows that, while it may have been possible
> for "threats" to be made, there was no evidence that they could or
> would be carried out immediately, if ever.  The only evidence of
> the mere possibility of the ranting being ever remotely carried out
> was created well after the fact, by Officer Bradley.

(Am. Pet. at 51.)[15]  Petitioner also alleges that evidence was withheld from the defense in violation of Brady v. Maryland, 373 U.S. 87 (1963) because "the police did not state in their reports that they told the victims about the shotgun in the car."  (Traverse at 42.)

Petitioner first raised these claims in his petition for writ of habeas corpus filed in the California Superior Court.  (Answer, Ex. 5.)  The Superior Court denied the claim on the grounds that petitioner "allege[d] no new evidence nor any issues that could not have been appealed or for which a writ of habeas corpus is applicable."  (Id. at consecutive p. 4.)  In a

---

[15]  In support of this claim, petitioner notes that employee Ken Wilkins admitted he first learned that petitioner had a gun in his car when he was so informed by Officer Bradley. Wilkins' exact testimony was that, although petitioner told the employees of the pizza parlor he was going to blow their heads off, or "blow [them] away," he did not say that he had a gun or use the word "gun."  (RT at 70-71.)  Wilkins found out petitioner had a "shotgun" because "Officer Bradley [sic] stated that there was a shotgun in the back seat."  (Id.)

1    subsequent petition for writ of habeas corpus, the California Court of Appeal denied all of

2    petitioner's claims with a citation to In re Hillery.  (Answer, Ex. 6.)  The California Superior

3    Court summarily denied all of petitioner's claims.  (Answer, Exs. 6, 7.)  It is unclear to this court

4    whether the decision of the California Superior Court is based purely on procedural grounds or is

5    a decision on the merits of petitioner's claim.  However, this court concludes that petitioner's

6    claims in this regard should be denied even under a de novo standard of review.

7           The defense of outrageous government conduct is limited to extreme cases in

8    which the government's conduct violates fundamental fairness and is "shocking to the universal

9    sense of justice mandated by the Due Process Clause of the Fifth Amendment."  United States v.

10   Russell, 411 U.S. 423, 431-32 (1973) (quotations omitted).  Due process rights would be violated

11   only by governmental conduct of a "demonstrable level of outrageousness."  Hampton v. United

12   States, 425 U.S. 484, 495 n.7 (1976) (Powell J., concurring).  See also United States v. Gurolla,

13   333 F.3d 944, 950 (9th Cir. 2003).  The Court of Appeals for the Ninth Circuit has found

14   outrageous government conduct in instances where the government has "engineer[ed] and

15   direct[ed] the criminal enterprise from start to finish," United States v. Smith, 924 F.2d 889, 897

16   (9th Cir.1991), and in "that slim category of cases in which the police have been brutal,

17   employing physical or psychological coercion against the defendant." United States v. Bogart,

18   783 F.2d 1428, 1435 (9th Cir.1986) (citation omitted), vacated in part on other grounds sub nom.

19   United States v. Wingender, 790 F.2d 802 (9th Cir.1986).

20          In Brady v. Maryland, the United States Supreme Court held "that the suppression

21   by the prosecution of evidence favorable to an accused upon request violates due process where

22   the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

23   of the prosecution."  373 U.S. at 87.  See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir.

24   2003).  There are three components of a Brady violation:  "[t]he evidence at issue must be

25   favorable to the accused, either because it is exculpatory, or because it is impeaching; the

26   /////

1  evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

2  must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

3          Petitioner has failed to demonstrate that a due process violation occurred in this

4  case. The actions of Officer Bradley in informing the pizza parlor employees that petitioner had

5  a gun in his car are not "shocking to the universal sense of justice." Wilkins already assumed

6  petitioner had a gun because of petitioner's threats to "blow his head off." He testified there was

7  "no doubt in his mind" that petitioner had a gun in his car. (RT at 70-71.) In fact, the testimony

8  reflects that all of the employees believed petitioner had a gun and could make good on his

9  threats even before they heard from the police that there was actually a shotgun in petitioner's

10  car. (Id. at 56, 69-70.) Petitioner has also failed to establish a Brady violation. The fact that the

11  police told the pizza parlor employees that petitioner had a gun in his car is not exculpatory under

12  the facts of this case. Further, even if the prosecution suppressed this information, petitioner did

13  not suffer prejudice. Accordingly, petitioner is not entitled to relief on these claims.

14      L.  Failure to Preserve Evidence (Claim 12/14)

15          Petitioner claims that his Fourteenth Amendment rights to due process and equal

16  protection were violated when the police officers at the scene failed to conduct any tests to

17  determine whether, and to what extent, petitioner was intoxicated. (Am. Pet. at 52.) Respondent

18  argues that petitioner refused to participate in chemical testing following his arrest, even though

19  he was informed that it was required by state law. This court concludes that petitioner's claims

20  in this regard should be denied even under a de novo standard of review.

21          Petitioner has failed to show that his federal constitutional rights were violated by

22  the failure of the police to force him to take a chemical test to determine whether he was

23  intoxicated. There is no evidence the police refused to conduct such a test; on the contrary,

24  petitioner was given the opportunity to submit to a test and refused. (RT at 96, 98-100.) The fact

25  that evidence of a blood analysis taken over a petitioner's objection is not inadmissible,

26  Schmerber v. California, 384 U.S. 757 (1966), does not place on police the affirmative duty to

1   administer such a test over the violent objections of an arrestee.  Arizona v. Youngblood, 488

2   U.S. 51, 58 (1988) (failure of police to preserve potentially useful evidence does not constitute a

3   denial of due process of law absent showing of bad faith on part of police); Villafuerte v.

4   Stewart, 111 F.3d 616, 625 (9th Cir.1997) (negligent failure to preserve evidence not a violation

5   of due process).  Accordingly, this claim should be denied.

6           To the extent petitioner's allegations contained in this claim are relevant to his

7   claims that the trial court erred in denying his motion for new trial, that his right to a fair trial was

8   violated, or that he received ineffective assistance of counsel, they will be addressed in

9   connection with this court's discussion of those claims.

10          M.  Evidence of Intoxication/Application of Cal. Pen. Code § 422 (Claim 13/15)

11          Petitioner raises several claims concerning his conviction on charges of making

12  terrorist threats, in violation of Cal. Pen. Code § 422.  His first such claim is that the evidence

13  was insufficient to support his conviction because he was too intoxicated to form intent.  (Am.

14  Pet. at 53-60.)  For the reasons set forth below in connection with this court's analysis of claim

15  No. 19/21, this claim should be denied.

16          Petitioner also claims that Cal. Pen. Code § 422 is unconstitutional on its face

17  because it is vague and overbroad and penalizes protected speech.  These contentions have all

18  been rejected by the California courts.  See e.g., People v. Fisher, 12 Cal.App.4th 1556,

19  1559-1560 (1993) (speech proscribed by Cal. Pen. Code § 422 is not protected by the First

20  Amendment just because speaker does not intend to implement the threat); People v. Toledo, 26

21  Cal.4th 221, 233 (2001) (Ca. Pen. Code § 422 is not unconstitutionally overbroad); People v.

22  Maciel, 113 Cal.App.4th 679 (2003) (Cal. Pen. Code § 442 is not unconstitutionally vague);

23  People v. Stanfield, 32 Cal.App.4th 1152, 159 (1995) (even conditional threats are punishable

24  under Cal. Pen. Code § 422).  Petitioner has cited no federal cases, and the court has found none,

25  which invalidate Cal. Pen. Code § 422 on constitutional grounds.  Accordingly, petitioner's

26  claim in this regard should be denied.  See Aponte, 993 F.2d at 707 (federal courts are bound by

43

1  a state court's construction of its own penal statutes); Oxborrow, 877 F.2d at 1399  (federal

2  courts must defer to a state court's interpretation of its own statute).

3          Petitioner also contends that the prosecutor's decision to charge him pursuant to

4  California's Three Strikes Law was vindictive and discriminatory.  To establish prosecutorial

5  vindictiveness, a defendant must show, through objective evidence, that the prosecutor acted

6  with genuine animus toward the defendant and the defendant would not have been prosecuted but

7  for that animus.  See United States v. Goodwin, 457 U.S. 368, 380 n.12 (1982).  In order to make

8  the required showing, a defendant must demonstrate that additional charges were brought "solely

9  to 'penalize' the defendant and could not be justified as a proper exercise of prosecutorial

10  discretion."  Id.

11          If a defendant is unable to prove an improper motive with direct evidence, he may

12  present circumstances from which an improper vindictive motive may be presumed.  Blackledge,

13  417 U.S. at 27.  However, to invoke such a presumption, the circumstances must "pose a realistic

14  likelihood of 'vindictiveness.'"  Id.  A presumption of vindictiveness is rarely applied to a

15  prosecutor's pretrial decisions because "a prosecutor should remain free before trial to exercise

16  [that] broad discretion entrusted to him to determine the extent of the societal interest in

17  prosecution."  Goodwin, 457 U.S. at 382.  Indeed, a prosecutor's charging decision is

18  presumptively lawful.  See Bordenkircher, 434 U.S. at 364; United States v. Armstrong, 517 U.S.

19  456, 464 (1996).

20          Petitioner has failed to make the necessary showing of prosecutorial

21  vindictiveness.  There is no evidence, apart from petitioner's unsupported allegations, that the

22  prosecutor acted with actual animus when he charged petitioner under California's Three Strikes

23  Law.  Accordingly, this claim should be denied.

24      N.  Trial Counsel's Performance/Competency Hearing (Claim 15/17)

25          Petitioner's next claim is that his trial counsel rendered ineffective assistance

26  when he failed to request a hearing to determine whether petitioner was competent to stand trial.

(Am. Pet. at 63.)  In support of this claim, petitioner refers the court to the following statement

made by a social worker from the Trinity County Counseling Center:

> On November 13, 1996, Mr. Strickler (a social worker) noted that
> he had been contacted by Mr. Dippery, Mr. Brown's attorney.  Mr.
> Dippery told him that Mr. Brown was against [sic] stating that he
> would kill himself if and when he goes to prison.  Mr. Dippery felt
> that going to trial was not wise and that Mr. Brown should take a
> deal.  Mr. Brown was opposed to taking a deal and was "railing a
> [sic] ideals of law' to Mr. Dippery.

(Exhibit A to Request for Judicial Notice at p. E-130.)  Petitioner argues that this note

demonstrates counsel was aware petitioner was not competent to stand trial.  Petitioner also notes

that he wrote a letter to the trial judge complaining about his trial counsel's alleged attempts to

convert him to the Jehovah's Witnesses faith and argues that this was additional evidence

supporting the need for a competency hearing.  (Am. Pet. at 63.)

This claim lacks merit and should be denied.  As described above, at the hearing

on petitioner's motion for new trial, petitioner's trial counsel stated that he "never had any

question or thought" that petitioner was not competent to stand trial.  RT at 405.)  Further, as

explained, the record of the trial proceedings demonstrates that petitioner clearly understood the

nature of the proceedings against him.  Under the circumstances presented here, petitioner's trial

counsel was not ineffective in failing to request a competency hearing.

O.  Failure to Provide Appropriate Medical Care (Claim 16/18)

Citing Estelle v. Gamble, 429 U.S. 97 (1976), petitioner claims that prison

authorities were deliberately indifferent to his medical needs while he was a pretrial detainee.

(Am. Pet. at 65-66.)  Petitioner also alleges that prison authorities failed to conduct a hearing

pursuant to Cal. Pen. Code § 4011.6 to determine whether he needed ongoing psychiatric

treatment and failed to follow the orders of his physician regarding the prescribing of

/////

/////

/////

1   medications and diagnostic procedures.  (Id.)[16]  Finally, petitioner alleges that jail staff "made

2   negative statements to, and about, Petitioner, and placed him in known threatening situations."

3   (Id. at 66.)  The California Superior Court denied this claim on the basis that "no grounds are

4   stated for which a writ can issue."  (Answer, Ex. 5 at consecutive p. 4.)

5          Similar to claim No. 10/12, discussed above, petitioner's allegations constitute a

6   challenge to the conditions of his confinement, which are not cognizable in this federal habeas

7   corpus action.  In the traverse, petitioner concedes that this claim "may not warrant habeas relief

8   by itself."  (Traverse at 41.)  However, he asserts that the allegations comprising this claim lend

9   support to several other claims, such whether he was competent to stand trial and whether he

10  received the effective assistance of counsel.

11         Petitioner's allegations that prison authorities did not provide appropriate medical

12  care prior to his trial will be considered in connection with petitioner's other claims, where

13  appropriate.  Petitioner has failed to demonstrate that his Eighth Amendment right to be free

14  from cruel and unusual punishment or any other constitutional provision was violated by the

15  /////

16

17      [16] Specifically, the state court record reflects that, while petitioner was in Trinity Hospital
    during a hunger strike, Blake Harris, a physician's assistant,

18          received a fax from Dr. Greene ordering a change in [petitioner's]
            medication, but had not made the prescribed changes because Mr.
19          Harris had "concerns" about the order and wanted to speak to Dr.
            Greene himself.  Mr. Harris denied having any bias against
20          [petitioner] to Ms. Hiett, but Ms. Hiett noted that Mr. Harris'
            attitude towards Mr. Brown was "very calloused."  Mr. Harris
21          apparently knew one of the alleged victims and insisted angrily to
            Ms. Hiett that [petitioner] was a manipulator and a malingerer.
22          Ms. Hiett discussed [petitioner's] Post Traumatic Stress Syndrome
            and explained what that meant to Mr. Harris.  (TCCC Progress
23          Notes 12/18/96.0

24          On December 20, 1996, [petitioner] called Ms. Hiett. [Petitioner]
            was upset because he felt he could not get proper medical
25          treatment at the jail.

26  (Exhibit A to Request for Judicial Notice, at p. E-132.)

1  failure of jail/prison staff to provide adequate medical care.  Accordingly, this claim should be

2  denied.

3       P.  Request for Substitute Counsel (Claim 17/19)

4            Petitioner's next claim is that the trial court improperly denied his requests for

5  substitute counsel, pursuant to People v. Marsden, 2 Cal.3d 118 (1970).[17]  Petitioner raised this

6  claim for the first time in a petition for writ of habeas corpus filed in the California Superior

7  Court.  The Superior Court denied the claim with the following reasoning: "Under Ground #17

8  he alleges that a Marsden hearing held on January 20, 1997 was improperly denied.  Petitioner

9  has admitted that incompetence of trial counsel was raised on appeal."  (Answer, Ex. 5 at

10  consecutive p. 4.)  It is unclear to this court whether the decision of the California Superior Court

11  is based purely on procedural grounds or constitutes a decision on the merits of petitioner's

12  claim.  However, this court concludes that petitioner's claim in this regard should be denied even

13  under a de novo standard of review.

14            The record reflects that two hearings were held to inquire into petitioner's

15  requests for substitute counsel.  (Reporter's Transcript of Proceedings, November 4, 1996,

16  January 27, 1997 (MRT), lodged April 4, 2001.)  At the first such hearing, petitioner was given

17  the opportunity to fully explain his concerns with his trial counsel.  (Id. at 1-3.)  Petitioner

18  appeared to be concerned with counsel's perceived lack of experience.  (Id.)  After hearing

19  petitioner's arguments, the court denied the motion, stating:

20            You haven't given me anything with which to base the granting of
             a Marsden motion for different court-appointed counsel other than
21            the fact that you don't agree with his assessment of the case.

22            He's read the discovery.  He's investigated it.  I see he's requested

23  /////

24

25       [17]  In Marsden, the California Supreme Court held that a trial court must permit a
   defendant seeking a substitution of counsel after the commencement of the prosecution's case to
26  specify the reasons for his request.

1          and been granted investigator costs in this case.  And the
           disagreement is not enough for the court to appoint other counsel.
2

3    (Id. at 3.)

4          Subsequent to this hearing, petitioner wrote a letter to the trial judge which states,

5    in pertinent part, as follows:

6          I have been going to church at jail and found something to believe
           in (Jesus) and told [petitioner's trial counsel] this, he asked if I
7          wanted to really study the bible, and I told him I was trying to learn
           anything I could about the Bible, so last Sunday he came to the jail
8          with a Mr. Hatfield from the Jehovah Witness church and gave me
           a bible and asked if Mr. Hatfield could come once a week to see
9          me.  I had to say yes because I feel if I tell [trial counsel] that I
           don't want to be a Jehovah's Witness he might get mad & not
10         represent me as good as he could.  I don't know what to do.

11   (CT at 397.)  The judge convened another hearing after receiving this letter.  At that hearing, the

12   court allowed petitioner to express his concerns in full and questioned both petitioner's trial

13   attorney and a correctional officer who was familiar with the matters expressed in the letter.

14   (MRT at 6-12.)  At the end of the hearing, petitioner indicated that the matter had been resolved

15   at the jail, stated that he wished to continue with his present counsel, and withdrew his request

16   for substitute counsel.  (Id. at 12-13.)  The trial judge accepted petitioner's withdrawal and stated

17   that he would have denied the motion for substitute counsel in any event.  (Id. at 13.)

18         Petitioner's claim in the instant petition appears to be concerned mainly with the

19   second Marsden hearing.  Petitioner acknowledges that he withdrew his request for substitute

20   counsel at that hearing, but argues that his waiver was ineffective because he was under the

21   influence of psychotropic medications.  (Am. Pet. at 68-69; Traverse at 42.)  Petitioner also states

22   that he was not able "to speak openly with the court about his concerns and fears, due to the fear

23   that counsel would retaliate," and that the correctional officer present at the hearing "effectively

24   coerced Petitioner into withdrawing his request."  (Am. Pet. at 68.)  The gist of petitioner's claim

25   is that because of his mental state, which prevented him from speaking his mind, "none of the

26   reasons stated for new counsel were resolved."  (Id. at 69.)

1    Where a defendant is proceeding with the assistance of counsel, he may move to

2  dismiss or substitute counsel, whether appointed or retained.   The grant or denial of such a

3  motion may depend on its timeliness and the nature of the conflict between the defendant and

4  current counsel.  United States v. McClendon, 782 F.2d 785, 789 (9th Cir. 1986).  In assessing on

5  direct appeal a federal trial court's decision to deny a motion to substitute counsel, the court

6  looks at three factors:  "'(1) timeliness of the motion to dismiss counsel; (2) the adequacy of the

7  court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant

8  and his attorney was so great that it resulted in a total lack of communication preventing an

9  adequate defense.'"  Id. (quoting United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979)).  See

10 also, United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000).

11    The United States Court of Appeals for the Ninth Circuit has ruled that in

12 assessing such a claim in the context of a habeas corpus proceeding, the focus is different than

13 that on direct review.  In  Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc) the court

14 stated:

15        Our primary reason for accepting this case for en banc review was
         to correct the standard of review we have been using to examine
16        the constitutionality of a state court's handling of a motion to
         substitute appointed counsel based on allegations of an
17        irreconcilable conflict.  In Bland, we said that the test is whether a
         state court's denial of such a motion was for an "abuse of
18        discretion."  Bland, 20 F.3d at 1475.

19                                              * * *

20        [O]ur only concern when reviewing the constitutionality of a state-
         court conviction is whether the petitioner is "in custody in
21        violation of the Constitution or laws or treaties of the United
         States."  28 U.S.C. § 2254(a).  See also Coleman v. Thompson,
22        501 U.S. 722, 730, 111 S.Ct. 2546. 115 L.Ed. 640 (1991) ("The
         [habeas] court does not review a judgment but the lawfulness of
23        the petitioner's custody simpliciter.") (emphasis in original).  A
         particular abuse of discretion by a state court may amount also to a
24        violation of the Constitution, but not every state court abuse of
         discretion has the same effect.  Accordingly, to the extent that they
25
         conflict with this opinion, we overrule Bland and Crandell v.
26        Bunnell, 144 F.3d 1213 (9th Cir. 1998).

1    Id. at 1024-25 (footnotes omitted).  In Schell the court determined that it was "well established

2    and clear that the Sixth Amendment requires on the record an appropriate inquiry into the

3    grounds of such a motion, and that the matter be resolved on the merits before the case goes

4    forward."  218 F.3d at 1025.  See also  Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982)

5    ("Thus, the state trial court's summary denial of a defendant's motion for new counsel without

6    further inquiry violated the Sixth Amendment.")

7            Under such an inquiry the state trial court's handling of petitioner's  motions for

8    substitute counsel passes constitutional muster.  At both hearings, the trial court allowed

9    petitioner the opportunity to fully explain on the record his problems with his trial counsel.  The

10   court focused on, fully explored, and appeared to resolve the conflicts expressed by petitioner.

11   Petitioner's unsubstantiated statements that his use of medication and his fear of counsel and the

12   deputy sheriff prevented him from effectively presenting his complaints to the judge are

13   contradicted by a review of the hearing transcripts.  Under the circumstances presented here, the

14   trial court did not err in denying either of petitioner's requests for new counsel.[18]  Accordingly,

15   petitioner's Marsden claims should be denied.

16           Q.  Sufficiency of the Evidence (Claim 19/21)

17           Petitioner claims the evidence was insufficient to support his conviction for

18   making terrorist threats and for being an ex-felon in possession of a firearm.  The court will

19   analyze these claims in turn below after setting forth the applicable legal principles.

20   /////

21   /////

22

23        [18]  Petitioner states in the traverse that his counsel attempted to "religiously convert" him
     during attorney visits.  (Traverse at 42.)  There is no evidence in the record that any attempts by
24   counsel to discuss religion with petitioner affected counsel's performance at trial.  In addition,
     counsel expressly addressed this issue at the second Marsden hearing, stating that he had assured
25   petitioner, "and I believe he trusts my assurances, that this is not anything that's going to
     interfere with my representation."  (MRT at 10.)  Petitioner agreed that he trusted his counsel on
26   this point.  (Id. at 11.)

1        1. Legal Principles

2        The Due Process Clause of the Fourteenth Amendment "protects the accused

3  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

4  constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There

5  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

6  favorable to the prosecution, any rational trier of fact could have found the essential elements of

7  the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also

8  Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question

9  under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

10  a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

11  443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

12  challenging the sufficiency of the evidence used to obtain a state conviction on federal due

13  process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n .13 (9th Cir. 2005).  In order

14  to grant the writ, the habeas court must find that the decision of the state court reflected an

15  objectively unreasonable application of Jackson and Winship to the facts of the case.  Id.

16        The court must review the entire record when the sufficiency of the evidence is

17  challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

18  vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

19  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

20  reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of

21  fact could draw conflicting inferences from the evidence, the court in its review will assign the

22  inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.1994).  The

23  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

24  the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

25  Cir.1991).  "The question is not whether we are personally convinced beyond a reasonable doubt.

26  It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v.

1   Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines sufficiency of the

2   evidence in reference to the substantive elements of the criminal offense as defined by state law.

3   Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

4                  2.  Making Terrorist Threats

5                  Petitioner claims that the evidence is insufficient to support his conviction for

6   making terrorist threats.  He argues that the evidence demonstrated only that he was so

7   intoxicated at the time of the events in question that he was unable to form any criminal intent

8   and that the restaurant employees, and not petitioner, were the aggressors.  He also argues that:

9   (1) the police moved the shotgun from the back seat to the front seat, making it appear that

10  petitioner intended to follow through on his threats against the restaurant employees; and (2) the

11  victims falsely claimed that petitioner threatened them with a gun only because the police told

12  them there was a shotgun in petitioner's car.  Petitioner states, "the misconduct committed by the

13  Police officers involved, by returning to the scene and informing the alleged "Victims" that a

14  shotgun was found, created the climate of fear necessary for the sustainment of a conviction

15  under 422. P.C."  (Traverse at 44.)

16                 Petitioner's claim in this regard was rejected by the California Court of Appeal in

17  a written decision on petitioner's direct appeal, and by the California Supreme Court without

18  comment on petition for review.  (See Exs. 3 & 5 to Answer.)  The Court of Appeal described its

19  reasoning as follows:

20              Viewed in the light most favorable to the verdict, the record shows
                that after ordering his pizzas, [petitioner] made a series of threats
21              that terrorized the workers in the restaurant.  First, he bragged
                about his drugs and claimed if anyone turned him in he would
22              return and kill them.  He then directly threatened Beyer by telling
                him [petitioner's] face was the last he would see.  [Petitioner] was
23              serious when he said this and those who heard it took it as a threat.
                [Petitioner] then threatened to blow away Wilkins and Beyer.
24              Although Wilkins retreated from his initial testimony that
                [petitioner] said he had a gun, it was not obvious to those in the
25              restaurant that [petitioner] was unarmed.  Further, he went out to
                his car and rummaged around as if looking for his weapon.
26

                                          52

1

2

3

4

> "[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone."  (People v. Mendoza (1997) 59 Cal.App.4th 1333, 1340.)

5

6

7

8

9

10

11

12

13

14

15

> The surrounding circumstances were of increasing terror; the threats became more direct and specific.  Unsure what he might do, the frightened workers tried to keep him calm and get rid of him quickly; Wilkins got a knife for defense. [Petitioner] contends his statement about blowing away anyone who turned him in for drugs was too conditional to serve as a threat. [Petitioner] relies on People v. Brown (1993) 20 Cal.App.4th 1251, in arguing the threat must be unconditional.  The Supreme Court has disapproved Brown on this point; Penal Code section 422 does not require an unconditional threat of death or great bodily injury.  (People v. Bolin (1998) 18 Cal.4th 297, 338, fn. 12.)  Further, it appears this statement was the basis for the count that was dismissed.  The following statements to Beyer and Wilkins were not conditional, but direct threats to hurt them.  The witnesses to these threats testified [petitioner] appeared serious when he threatened them and they were scared. [Petitioner] protests the individuals' reactions were irrelevant, but they were relevant as to whether the threats "cause[d] that person reasonably to be in sustained fear for his or her own safety."  (Pen. Code, § 422.)  There was sufficient evidence to sustain the convictions for making terrorist threats.

16   (Opinion at 7-9.)

17         The state court's conclusion that there was sufficient evidence to establish

18   petitioner's guilt beyond a reasonable doubt is not an unreasonable application of the federal due

19   process standards set forth above.  The fact that there was also evidence at trial which supported

20   petitioner's version of the events is not dispositive, nor are petitioner's unsupported claims that

21   the police manipulated the evidence and that the witnesses testified falsely.  Under the facts

22   presented at trial, and viewing the evidence in the light most favorable to the prosecution, a

23   reasonable trier of fact could have found beyond a reasonable doubt that petitioner was guilty of

24   making terrorist threats, as that crime is defined by California law.  Accordingly, this claim

25   should be denied.

26   /////

53

1          3.  Ex-Felon in Possession of a Firearm

2                Petitioner also claims there is insufficient evidence to support his conviction

3    pursuant to Cal. Pen. Code § 12021(a) for being an ex-felon in possession of a firearm.

4    Petitioner notes that his fingerprints were not found on the shotgun in his car.  He also argues the

5    evidence presented by the prosecution indicated that he was in possession or had control of a

6    "Remington Model 870 'shotgun'" with a barrel of twenty-six inches, but that the statute with

7    which he was charged only prohibits a firearm with a barrel length of eighteen inches or less that

8    can be "concealed upon the person."  (Am. Pet. at 84-85.)  Finally, petitioner alleges that the

9    prosecutor "blacked out and tampered with the instructions" related to this charge.  (Id. at 85.)

10               This claim was raised for the first time in petitioner's application for a writ of

11   habeas corpus filed in the California Superior Court.  (Answer, Ex. 5.)  The Superior Court

12   denied the claim on the grounds that it "could have been put forth during appeal."  (Id. at

13   consecutive p. 4.)  In a subsequent petition for writ of habeas corpus, the California Court of

14   Appeal denied all of petitioner's claims with a citation to In re Hillery.  (Answer, Ex. 6.)  The

15   California Superior Court summarily denied all of petitioner's claims.  (Answer, Exs. 6, 7.)

16   Under these circumstances, the court will review this claim de novo.  Nulph, 333 F.3d at 1056

17   (9th Cir. 2003); Killian, 282 F.3d at 1208.

18               The evidence introduced at petitioner's trial established that the police found a

19   shotgun in petitioner's car between the driver's and passenger's seats.  Although petitioner

20   suggests that a police officer moved the shotgun from the back seat to the front seat to make it

21   look as if petitioner was aware of the presence of the firearm in his car, there is no evidence to

22   that effect in the court record and the court rejects any such suggestion.  Petitioner's argument

23   that the shotgun found in his car did not fall within the parameters of § 12021(a) has been

24   addressed and rejected above in connection with claim No. 4/6.  Finally, although petitioner

25   states that the prosecution tampered with the jury instruction explaining this charge, a review of

26   the instruction reflects that only minor modifications, such as deletion of the feminine personal

1   pronoun, were made before reading the instruction to the jury.  (See CT at 75.)  After reviewing

2   the entire record, this court finds that there was sufficient evidence to establish petitioner's guilt

3   of being an ex-felon in possession of a firearm beyond a reasonable doubt.  Accordingly, this

4   claim should be denied.

5          R.  Right to be Present (Claim 20/22)

6          Petitioner's next claim is that the trial judge's ex parte discussions with the jurors

7   violated his right to be present at all critical stages of the proceedings.  This claim has been

8   addressed above in connection with claim 8/10.  For the reasons stated, this claim should be

9   denied.

10         S.  Violation of Plea Agreement (Claim 21/23)

11         Petitioner claims that the prosecutor violated the terms of a 1989 plea agreement

12   when he enhanced petitioner's current sentence with a prior burglary conviction.  (Am. Pet. at

13   95-99.)

14         This claim was raised for the first time in petitioner's application for a writ of

15   habeas corpus filed in the California Superior Court.  (Answer, Ex. 5.)  The Superior Court

16   rejected petitioner's claim with the following reasoning:

17               Under Ground #21 petitioner claims he was improperly sentenced
                 on an enhancement occurring out of a 1984 burglary case out of
18            Contra Costa County.  He claims Case #28201 was terminated in
                 exchange for a guilty plea.  Petitioner has supplied a transcript of a
19            proceeding wherein the court terminated a CRC return upon a
                 guilty plea to new charges.  Petitioner apparently misunderstood
20            what is meant by termination of a CRC case.  He thought it meant
                 termination of the felony conviction.

21

22   (Id. at consecutive p. 4.)

23         A guilty plea is invalid if induced by a promise which renders the plea

24   involuntary.  Machiброda v. United States, 368 U.S. 487, 493 (1962); Chizen v. Hunter, 809 F.2d

25   560, 561 (9th Cir. 1986).  When a plea agreement rests in any significant degree on a promise or

26   agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration,

1  such promise must be fulfilled.  <u>Santobello v. New York</u>, 404 U.S. 257, 262 (1971); <u>Johnson v.</u>

2  <u>Lumpkin</u>, 769 F.2d 630, 633 (9th Cir. 1985).  Claims of a breached plea agreement are analyzed

3  according to contract law standards of interpretation, such that a court looks to what was

4  reasonably understood by the parties to be the terms of the agreement and whether or not those

5  terms were fulfilled.  <u>See</u> <u>Buckley v. Terhune</u>, ___ F.3d ___, 2006 WL 679823 (C.A. 9 (Cal.));

6  <u>United States v. Kramer</u>, 781 F.2d 1380, 1387 (9th Cir. 1986).

7          The state court record reflects that in 1989 petitioner pled guilty to receiving

8  stolen property and theft of an access card.  (Exhibit A to Request for Judicial Notice, at p. E-

9  257.)  In connection with that plea, petitioner's previous commitment to the California

10 Rehabilitation Center (C.R.C.) in connection with a prior burglary conviction was "terminate[d]

11 unsuccessfully."  (<u>Id.</u> at p. E-256, 261.)  According to the sentencing judge, petitioner had been

12 previously committed to the Department of Corrections for treatment at the C.R.C. and he was on

13 outpatient status from that facility at the time he committed the crimes for which he was then

14 pleading guilty.  (<u>Id.</u> at E-264.)

15         Petitioner states that when he entered his guilty plea, he understood that the prior

16 burglary conviction would be terminated for all purposes and for any future use.  (Am. Pet. at

17 95.)  In support of this argument, he cites the following exchange at the 1989 change of plea

18 hearing:

19         BY MS. FRANKS (the prosecutor):

20         Q.  The other case that you have before this court is a C.R.C.
           return.

21
           What the Court is going to do, based upon your plea of guilty here
22         today, he's going to terminate that particular case; do you
           understand?

23         A. Yes.

24

25 (Exhibit A to Request for Judicial Notice, at p. E-261.)

26 /////

1      Petitioner has failed to demonstrate that his due process rights were violated by

2  the use of his prior burglary conviction to enhance his current sentence.  As explained by the

3  California Superior Court, the 1989 plea agreement merely resulted in a termination of the prior

4  C.R.C. commitment because petitioner had committed a new crime – the felony conviction itself

5  was not terminated.  Petitioner states that when he, "a layman in the law, plead guilty on March

6  3, 1989, he understood that on the basis of his guilty plea, the 1984 burglary case, which resulted

7  in a civil commitment to C.R.C., would be <u>terminated</u>."  (Am. Pet. at 95.)  However, there was

8  no mention or promise at the 1989 hearing that petitioner's prior burglary conviction was

9  dismissed for all purposes or that it could not be used later to enhance a future sentence.  Further,

10 petitioner agreed at the 1989 change of plea hearing that he "had enough time to meet and confer

11 with Mr. Gray, [petitioner's] lawyer, and to discuss with him fully all aspects of this case."  (<u>Id.</u>

12 at 8.)  Petitioner also agreed that no promises or representations had been made to induce him to

13 plead guilty.  (Docket #7 at p. 7.)  In short, petitioner has failed to establish that the prosecutor or

14 the courts breached any express agreement contained in a prior plea agreement.  The decision of

15 the California Superior Court rejecting petitioner's claim in this regard is not an unreasonable

16 determination of the facts, nor is it contrary to or an unreasonable application of federal law.

17 Accordingly, petitioner is not entitled to relief.

18      T.  <u>Self-Defense Jury Instructions (Claim 22/24)</u>

19      Petitioner claims that the trial court erred in failing to give a jury instruction on

20 self-defense.  (Am. Pet. at 100.)  This claim has been addressed above, in connection with

21 petitioner's claim No. 5/7.  For the reasons explained above, the claim should be denied.

22      U.  <u>Trial Court Erred in Denying Petitioner's Motion for New Trial (Claim 2/4)</u>

23      In his next claim, petitioner argues that the trial court erred in not granting

24 petitioner's motion for new trial.  Petitioner argues that the trial court's ruling is "a conflict of

25 interest" because "it is the Trial Court itself which allowed the violations to take place."

26 /////

57

1  (Traverse at 16.)  He asks that this court "read the Motion for New Trial itself to corroborate

2  what the Petition alleges."  (Id.)

3          Petitioner's claim in this regard was raised for the first time in his petition for writ

4  of habeas corpus filed in the California Superior Court.  The Superior Court denied the claim on

5  the basis that "petitioner does not state any claim that was not or could not have been argued by

6  appeal."  (Answer, Ex. 5 at 2.)  Because this appears to be a decision based purely on procedural

7  grounds, this court will evaluate petitioner's claim de novo.  Nulph, 333 F.3d at 1056 (9th Cir.

8  2003); Killian, 282 F.3d at 1208.

9          As described above, after petitioner was convicted he retained new counsel and

10  filed a motion for new trial.  Petitioner describes the issues raised by that motion as: (1) whether

11  petitioner was competent to stand trial; (2) whether petitioner received a "fair hearing" on his

12  motion for substitute counsel; (3) whether "the government" failed to provide adequate medical

13  care to petitioner, as ordered by his physician; (4) whether petitioner received the effective

14  assistance of counsel; (5) whether there was sufficient evidence to support petitioner's

15  convictions; (6) whether petitioner's right to a fair trial was violated when law enforcement

16  manufactured evidence against him; (7) whether petitioner was denied due process when the state

17  failed to preserve evidence of his intoxication; (8) whether the trial court erred in failing to give

18  an instruction on self-defense; and (9) whether the cumulative effect of the above-described

19  errors deprived petitioner of a fair trial.  The trial court conducted a lengthy hearing, received

20  evidence, and heard testimony from several witnesses, including petitioner's trial counsel.  This

21  court has read petitioner's motion for a new trial and the documents pertaining thereto and has

22  evaluated each of petitioner's claims which formed the basis of the motion.  After conducting

23  this review, and for the reasons described above, this court concludes that petitioner's federal

24  constitutional rights were not violated by the trial court's denial of his motion for new trial.

25  Accordingly, this claim should be denied.

26  /////

58

V.  <u>Trial Counsel's Performance (Claim 18/20)</u>

Petitioner includes a separate claim listing the following alleged error of counsel:

1.  Counsel failed to raise the issue of Petitioner's mental and psychological problems and that Petitioner was being treated with very strong dosages of prescription medications for anxiety, insomnia, and depression.

2.  Counsel was aware of Petitioner's psychological condition, and contacted Mr. Strickler, of TCCC, about it, stating that he felt Petitioner was unable to stand trial and should take a deal. (Exhibit H, TCCC Progres Notes 11/13/96.)

3.  Counsel "failed" to move to have prosecution excluded from the January 28, 1997, *Marsden* hearing.

4.  Counsel "failed" to investigate why petitioner was on medication and how it might effect the trial, the defense and the prosecution of Petitioner, as well as Petitioner's ability to assist in preparing his defense and if he should testify or not at trial.

5.  Counsel "failed" to investigate and raise doubts to Petitioner's competency at the time of the alleged offense and his statements to law enforcement.  Thus, "failing" to investigate crucial and well known defenses.

6.  Counsel appeared to be more concerned about converting Petitioner to Jehovah's Witness than providing an adequate assistance of counsel.  (Exhibit I, R.T. Jan. 28, 1997, pp. 12-13.)

7.  Counsel "failed" to investigate "post traumatic stress disorder" and "severe clinical depression" that Petitioner suffers from, even though the counselors of TCCC had informed him of these issues. Thus, <u>discarding</u> legitimate and valuable defenses that were raised by Petitioner, and the counselors of TCCC to him.  Defenses that would have provided proof that Petitioner lacked the requisite mental state to commit the charged offenses, let alone the mental capacity needed to formulate the mental state to commit the charges crimes.

8.  Counsel failed/refused to give Petitioner any copies of the police reports or any other discovery in the case.  Thus, depriving Petitioner the knowledge of the extreme nature of the allegations against him.  (See Deposition of James Dippery.)

9.  Counsel failed/refused to investigate intoxication as a defense to the specific intent crimes charged.  These items were apparent in the police reports, witness statements, and inventory of Petitioner's mother's car.

10.  Counsel failed/refused to investigate and present a defense of self-defense.  Even though this defense is clearly available upon examination of Ken Wilkins' statements and testimony, as well as by Petitioner's statements and testimony.  Therefore, Petitioner lost a meritorious defense.

11.  Counsel was ineffective for failing to make an effective closing argument, whose theme appeared to have absolutely no relation to the case presented.

12.  Counsel failed to move to have charges dismissed, due to the government's failure to preserve exculpatory evidence.

13.  Counsel "failed" to move to have Petitioner's police statements excluded as fruit of the poisonous tree – police violated Petitioner's constitutional rights to counsel.

14.  Counsel "failed" to challenge the manufactured evidence by the law enforcement - alleged victims did not know of any weapon until law enforcement told them of it.  (R.T. P ___)

15.  Counsel "failed" to investigate that it would have been infeasible for the shotgun found by Officer        to be in the location alleged by the officer, and had the shotgun been actually there, then Petitioner could not have changed gears; thus, unable to drive the car as alleged by the officer.

16.  Counsel interfered with Petitioner's exercising of his First Amendment right to freedom of religion, by advising jail staff not to allow any other religion's representative to visit Petitioner, stating that he was now a Jehovah's Witness.

(Am. Pet. at 70-71.)  Petitioner claims that he was denied the effective assistance of counsel by virtue of these errors.

Most of the errors alleged by petitioner in this claim are duplicative of petitioner's other claims, described above.  Further, petitioner has failed to demonstrate prejudice with respect to any error.  Accordingly, petitioner's claims in this regard should be denied.

W.  Denial of the Right to a Fair Trial as a Result of Numerous Errors at Trial (Claims 1/3 and 23/25)

In claim 1/3, petitioner argues that his federal constitutional right to a fair trial was violated because of numerous trial errors and errors of counsel.  Petitioner describes those errors as follows:

1.  1. Introduction of manufactured evidence;

2.  2.  Loss of exculpatory evidence;

3.  3.  Failure of court to give self-defense instructions;

4.  4.  Counsel refusing/failing to prepare a proper defense;

5.  5.  Counsel refusing/failing to raise incompetency issues;

6.  6.  Petitioner was not competent to stand trial;

7.  7.  Petitioner, then defendant, being punished in the state prison
    before a conviction was reached in the case;

8.  8.  Ex-parte, off the record communications, by the judge to the
9.      jury in the hallway of the courthouse and the deliberations room.

10. 9.  Jury trial was continued out of petitioner's presence.

11. 10.  Petitioner was unfairly prejudiced when the jury saw him
    being removed from the Sheriff's van, surrounded by armed
12. deputies, in shackles, and being portrayed as a dangerous criminal
    and defendant, and then led past them, into the courthouse, before
13. deliberations.

14. 11.  Prosecutorial misconduct which forced the petitioner to
    characterize the testimony of Government Agents (police) as liars,
15. as well as the alleged victims.

16. (Am. Pet. at 2.)  This court has evaluated each of the above-listed claims and has determined that

17. none of them has merit.  For the reasons explained above, each of these individual claims should

18. be denied.

19.         In claim 23/25, petitioner claims that the cumulative effect of the errors at his

20. trial, including the errors listed above, denied him the right to a fair trial.  Although the United

21. States Supreme Court has not articulated a claim of "cumulative error," the Ninth Circuit has

22. stated that where "no single trial error examined in isolation is sufficiently prejudicial to warrant

23. reversal, the cumulative effect of multiple errors may still prejudice a defendant."  United States

24. v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  See also Karis v. Calderon,  283 F.3d 1117,

25. 1132 (9th Cir. 2002) (same).  Where individual errors looked at separately may not rise to the

26. level of constitutional error, the cumulative effect of such errors may so prejudice the defendant's

1    right to a fair trial that reversal is warranted.  See United States v. Berry, 627 F.2d 193, 200-01 &

2    n.7 (9th Cir. 1980); see also United States v. Nadler, 698 F.2d 995, 1002 (9th Cir. 1983).

3             This court has addressed all of the issues raised in the pending petition and has not

4    found merit with respect to any of petitioner's claims.  The court concludes that there were no

5    errors which rendered petitioner's trial fundamentally unfair, either individually or in their

6    cumulative effect.  Accordingly, petitioner's claim of cumulative error should be denied.

7             X.  Ineffective Assistance of Appellate Counsel (Claim 3/5)

8             Petitioner claims that his appellate counsel rendered ineffective assistance because

9    of his failure to communicate sufficiently with petitioner and/or his family and his failure to raise

10   meritorious issues suggested by petitioner and contained in petitioner's state habeas petitions and

11   the petition before this court.  (Am. Pet. at 6-7.)

12            The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

13   v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

14   However, an indigent defendant "does not have a constitutional right to compel appointed

15   counsel to press non-frivolous points requested by the client, if counsel, as a matter of

16   professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

17   (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

18   ability of counsel to present the client's case in accord with counsel's professional evaluation

19   would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

20   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

21   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

22   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

23   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

24   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

25   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

26   prevailed on appeal.  Miller, 882 F.2d at 1434 n.9.

Petitioner's appellate counsel reviewed the trial transcripts and apparently concluded that any claims not raised in the opening brief lacked merit and should not be raised. (Exhibit A to Request for Judicial Notice at consecutive p. E-2-E-7.)  As described in these findings and recommendations, this court has reached the same conclusion.  Appellate counsel's decision to press only those claims he believed had the most merit was within the range of competence demanded of attorneys in criminal cases.  Accordingly, petitioner is not entitled to relief on this claim.

## MOTIONS FOR DISCOVERY

On October 3, 2005, petitioner filed a motion for discovery.  Therein, he requests the following discovery with respect to his claims concerning his competency to stand trial: (1) petitioner's complete medical and psychiatric history "from whatever source;" (2) the files and records of petitioner's trial counsel; (3) the state prosecutor's files and records; (4) all documents pertaining to any evaluations of petitioner by Albert Globus, M.D., who was retained by petitioner in connection with his motion for new trial, but was apparently not presented as a witness at the hearing.  Petitioner also requests discovery with respect to his claim that his appellate counsel rendered ineffective assistance when he failed to raise on appeal all of the claims raised in the instant petition, and particularly the issue of "exculpatory evidence."

On February 2, 2006, petitioner filed a second motion for discovery.  Therein, he seeks discovery related to his claim that he was denied the right to a fair trial when he was observed by the jury in handcuffs and leg shackles.  He requests permission to: (1) interview and depose jurors to see if they saw petitioner in shackles and, if so, to what extent; (2) interview and depose petitioner's trial counsel to ask about the circumstances surrounding petitioner's shackling, if any, and about his "apparent failure to move for mistrial on those grounds;" (3) subpoena Trinity County jail/transportation procedures regarding to their rules about shackling inmates during the ride to and from the courthouse; and (4) subpoena petitioner's jail records to determine if he has a disciplinary record.

1        Petitioner's discovery motions came on regularly for hearing February 23, 2006.

2 Michael Bigelow appeared for petitioner.  Laura Wetzel Simpton appeared for respondents.

3 After the hearing, the motions were submitted to the court for decision.

4        Rule 6 of the Rules Governing Section 2254 Cases in the United States District

5 Courts permits discovery in habeas corpus actions.  A habeas petitioner does not enjoy the

6 presumptive entitlement to discovery of a traditional civil litigant and discovery is available only

7 in the discretion of the court and for good cause shown.  See Rules Governing Section 2254

8 Cases, Rule 6(a) 28 U.S.C. foll. § 2254; Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999).

9 See also Hayes v. Woodford, 301 F.3d 1054, 1065 n.6 (9th Cir.2002) (discovery is available

10 "only in the discretion of the court and for good cause").  After a review of the record and

11 petitioner's claims, the court does not find good cause for an order granting the discovery

12 petitioner seeks.

13        Accordingly, IT IS HEREBY ORDERED that petitioner's October 3, 2005 and

14 February 2, 2006, motions for discovery are denied.

15        IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

16 habeas corpus be denied.

17        These findings and recommendations are submitted to the United States District

18 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

19 days after being served with these findings and recommendations, any party may file written

20 objections with the court and serve a copy on all parties.  Such a document should be captioned

21 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22 shall be served and filed within ten days after service of the objections.  The parties are advised

23 /////

24 /////

25 /////

26 /////

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 20, 2006.

UNITED STATES MAGISTRATE JUDGE

JFM:8:brown559.hc

65